In re F & T CONTRACTORS, INC., Debtor.

FEDERAL DEPOSIT INSURANCE CORPORATION, A Corporation organized and existing under the laws of the United States of America, Plaintiff and Counter-Defendant,

v.

David CUVRELL, Receiver/Trustee of F & T Contractors, Inc., F & T Contractors, Inc., Bankrupt, and F & T Investment & Leasing Company, a Michigan Co-Partnership, Defendants and Counter-Plaintiffs,

and

Federal Deposit Insurance Corporation, in its capacity as Receiver of the Northern Ohio Bank, Counter-Defendant.

Bankruptcy No. 75–30096.

United States Bankruptcy Court, E. D. Michigan, S. D.

March 3, 1982.

---

Larry E. Powe, Freeman, McKenzie, Matthews, Scherer & Stepek, P. C., Mount Clemens, Mich., for plaintiff and counter-defendant.

Dennis M. Haley, Winegarden, Booth, Ricker, Shedd, Haley & Lindholm, Flint, Mich., for defendants and counter-plaintiffs.

## MEMORANDUM OPINION

HAROLD H. BOBIER, Bankruptcy Judge.

*Introduction*

The subject matter of this lawsuit concerns a complex contractual dispute between the Federal Deposit Insurance Corporation (hereinafter "FDIC") and the bankrupt, F & T Contractors, Inc. (herein-after "F & T"). The FDIC, "acting in its corporate capacity," is the plaintiff, and the FDIC, "acting in its receivership capacity," and the FDIC, "acting in its corporate capacity," are the counter-defendants. F & T is the defendant and counter-plaintiff, in this law suit.

F & T was a Michigan corporation and exclusively involved in the construction business for approximately twenty years. According to the testimony of its president, Theodore Birnbaum, F & T was a substantial construction contractor with approximately six million dollars in gross sales and one hundred fifty employees in 1973. F & T performed not only as a general contractor for commercial and residential construction, but it had divisions with capabilities for excavation, electrical contracting, mechanical contracting, drywall contracting, painting, plumbing and heating and airconditioning. The corporation had constructed substantial multiple-unit residential developments in its history. Just prior to the commencement of the construction project which forms the subject matter of this lawsuit, it had completed a 220-unit apartment/townhouse development project which utilized funds insured by the Department of Housing and Urban Development (hereinafter "HUD"). In addition, the testimony indicated that F & T had been involved extensively in the construction of single family residences built with HUD-insured mortgage funds.

Old Orchard by the Bay Associates (hereinafter "Old Orchard"), a Michigan limited partnership, was created by Theodore Birnbaum and others to build a 220-unit apartment complex to be known as Old Orchard by the Bay. Theodore Birnbaum testified that he was the general partner of Old Orchard and owned a 15% partnership interest in exchange for the services he was to perform for the partnership. Old Orchard had been formed for the sole and limited purpose of acquiring the ownership of the real estate upon which the Old Orchard by the Bay project was to be erected. F & T entered into a construction contract with Old Orchard on May 1, 1974, for the

construction of the Old Orchard by the Bay project for a total contract price of $4,235,-331. ('81 Ex. 3.)[1] An amendment to the construction contract, also dated May 1, 1974, was executed for the purpose of providing a profit to F & T in the amount of $164,805.12, or 4% of the contract price. ('81 Ex. 4.) The project was to be constructed with a HUD-insured mortgage extended by Advance Mortgage Corporation (hereinafter "Advance").

Prior to the execution of the construction contract with Old Orchard, Theodore Birnbaum and his brother, Fred Birnbaum, transferred F & T's motor vehicles, equipment and fixtures to F & T Investment and Leasing Company (hereinafter "Investment"), and in consideration therefore, took back a security agreement in the amount of $397,-500 ('77 Ex. 9). Investment was a Michigan limited partnership which leased certain items of personal property to F & T. In fact, Theodore Birnbaum testified that most of the equipment used by F & T during the construction of the Old Orchard by the Bay project was owned by and leased from Investment.

In order to finance the construction of the Old Orchard by the Bay project, the owner of the real property, Old Orchard, was required by the construction lender, Advance, as a condition imposed by HUD, the mortgage insurer, to procure three different irrevocable letters of credit. The letters of credit were obtained from the Northern Ohio Bank (hereinafter "NOB")[2] on July 2, 1974, as follows:

1. Letter of Credit No. 1129, in the amount of $95,098, for the purpose of meeting any initial operating deficits caused by a failure to timely complete the project and generate sufficient rental income to meet the end mortgage amortization schedule and other operating expenses ('77 Ex. 2),

2. Letter of Credit No. 1130, in the amount of $172,365.62, for the purpose of guaranteeing the payment of the end mortgage commitment fee ('77 Ex. 1), and

3. Letter of Credit No. 1131, in the amount of $7,650, for the purpose of providing an escrow deposit for the construction of certain off-site improvements and roads ('77 Ex. 3).

The letters of credit were issued for the benefit of Advance, as the construction

---

1. There are five different "sets" of exhibits which have been received in evidence since the commencement of trial. They are as follows:
   a) Plaintiff's exhibits numbered 1 through 10, received on August 24, 1977.
   b) Defendant's exhibits lettered A through K, received on August 24, 1977.
   c) Counter-plaintiff's exhibits numbered 1 through 42, received on March 23–27, 1981.
   d) Counter-defendant's exhibits lettered A through HH, received on March 23–27, 1981.
   e) Joint exhibits numbered I through III, received on March 24, March 27 and June 16, 1981.
   All references to the exhibits in the body of this opinion will indicate the year and number or letter of the exhibit. For example, the reference "('81 Ex. 3.)" refers to counter-plaintiff's exhibit number 3, received in evidence on March 23, 1981. A complete list of all the exhibits is appended to this opinion for further reference.

2. As a result of the frequent use of abbreviations and acronyms to refer to the various (and lengthy) names of the entities involved in this lawsuit, a recapitulation of them seems appropriate. They are as follows:

   a) *Advance* refers to Advance Mortgage Corporation, the construction mortgage lender.
   b) *F & T* refers to F & T Contractors, Inc., the bankrupt and general contractor for the Old Orchard by the Bay apartment project.
   c) *FDIC* refers to the Federal Deposit Insurance Corporation; specific references between "corporate" and "receivership" capacities will be made in the body of the opinion.
   d) *HUD* refers to the Department of Housing and Urban Development, the construction mortgage insurer.
   e) *Investment* refers to F & T Investment and Leasing Company, the owner of most of the equipment used to construct the project.
   f) *NOB* refers to the Northern Ohio Bank, the issuer of the letters of credit.
   g) *Old Orchard* refers to Old Orchard by the Bay Associates, the limited partnership which owed the real property upon which the project was constructed.
   h) *Old Orchard by the Bay project* refers to the construction project which included the 220-unit apartment/townhouse development as well as some minor off-site construction.

lender, and for the account of Old Orchard. They were secured by mortgage notes signed by Old Orchard as maker and by F & T and Investment as comakers. Mortgages were also give to NOB by Investment, on land it owned, to secure the letters of credit. ('77 Exs. 4–6.)

On July 3, 1974, Advance executed a mortgagee's certificate which allowed for advances to be made to F & T pursuant to the construction mortgage ('81 Ex. 5). Shortly thereafter, construction of the Old Orchard by the Bay project was commenced, and it continued without delay until early February of 1975.

*Failure of the NOB and the Bankruptcy of F & T*

On February 14, 1975, the superintendent of banks for the state of Ohio appointed the Federal Deposit Insurance Corporation as the receiver for the Northern Ohio Bank in a liquidation proceeding commenced that day in the Cuyahoga County Court of Common Pleas. Four days later, the Court of Common Pleas entered an order approving the sale of certain assets of NOB and transfering all of its liabilities. The sale of assets and transfer of liabilities which was approved by the Court was the "typical" method used by the FDIC in liquidating an insolvent national bank.[3] Basically, the liquidation process was accomplished by the FDIC, acting in its receivership capacity, executing four written agreements on Feb-

ruary 16 and 17, 1975. These agreements can be briefly summarized as follows:[4]

1. An agreement executed between the FDIC as the receiver of NOB and the FDIC, acting in its corporate capacity, whereby the corporation purchased from the receiver all of NOB's "unacceptable assets and liabilities" for an "initial cash purchase price" of $90,250,000.

2. An agreement executed between the FDIC as the receiver of NOB and the National City Bank of Cleveland, Ohio (hereinafter "NCB" or "Assuming Bank") whereby NCB assumed all of the deposit liabilities of NOB and its acceptable assets.

3. An indemnity undertaking signed by the FDIC in its corporate capacity for the purpose of holding NCB harmless from any liabilities which were not specifically assumed by NCB in the agreement referred to above.

4. An agreement executed by the FDIC, as the receiver of NOB, and NCB, whereby NCB assumed $100,000,000 in deposit liabilities owing by NOB, and received in exchange therefore approximately $3,000,000 in cash, $3,000,000 worth of U. S. government securities and $90,250,000 in cash from the FDIC in its corporate capacity.

---

3. *See Federal Deposit Insurance Corporation v. Godshall*, 558 F.2d 220 (4th Cir. 1977) wherein the court described the usual procedure of the FDIC in liquidating a failed bank thusly:

> To meet the demands of Bank's depositors, and to prevent the disruption of vital business, FDIC immediately took the following steps: FDIC, as receiver, sold certain assets of Bank to Southern Bank & Trust Co. (Southern). These assets consisted of cash, currency, receivables due from other banks, government securities, and other items of established value. In return, Southern agreed to assume nearly all of Bank's liabilities (including obligations to depositors), and to re-open Bank's offices under Southern's name. FDIC, as receiver, agreed to pay Southern cash in an amount equal to the difference between the value of the assets Southern purchased and the amount of the liabilities Southern assumed. To raise that cash,

> FDIC, as receiver, sold the remainder of Bank's assets to itself, in its general corporate capacity, and FDIC, in its general corporate capacity, paid itself, as receiver, the cash needed to consummate the original transaction with Southern. FDIC also agreed that if, in the liquidation of the assets it purchased, it realized more than the purchase price, the costs of liquidation, reimbursement for another potential liability it had assumed, and a reasonable return, it would pay such 'excess recoveries' to itself, as receiver. (Footnote omitted.) *Id.* at 221–222.

4. Copies of these agreements were attached to and made a part of Joint Exhibit II which was received in evidence on March 27, 1981. The agreements were also a part of counter-plaintiffs' Exhibit 32 which was received in evidence on March 25, 1981.

The role of the FDIC as the receiver for NOB was narrow and short lived. Within four days of its appointment, the FDIC as receiver completely liquidated the Northern Ohio Bank. It did so by entering into a tripartite arrangement with the National City Bank and itself in its corporate capacity. It sold all of NOB's "acceptable assets" to NCB which consisted of cash on hand, certain receivables due from other banks, government securities, and certain funds provided by the FDIC itself. In return NCB agreed to assume all of NOB's deposit liabilities which were insured by the FDIC. The FDIC, as receiver, agreed to pay NCB a sum of cash equal to the difference between the value of the "acceptable assets" and the amount of the deposit liabilities assumed by NCB.

To raise those funds, the FDIC as receiver, sold the remainder of the NOB assets (i.e., the "unacceptable assets") to itself, in its general corporate capacity, and the FDIC, in its corporate capacity, paid itself, as receiver, the cash needed to consummate the transaction with NCB. In essence, the FDIC as the receiver was nothing more than a "straw man" used to transfer part of the assets and liabilities to NCB and the remaining assets and liabilities to the FDIC in its corporate capacity. By entering into such an arrangement, the FDIC-receiver was left with nothing but a promise from the FDIC in its corporate capacity to turn over any assets the corporation realized upon liquidation in excess of what the corporation paid for those assets. In other words, if the FDIC in its corporate capacity was able to liquidate the assets it purchased in excess of the $90,250,000 it had paid for those assets, then such "excess recoveries" would be returned to the FDIC in its receivership capacity of NOB. In fact, the liquidator of NOB's assets, Mr. William Bryant, testified in a trial deposition that at the conclusion of the sale, the FDIC-receiver retained no assets nor liabilities of NOB. ('81 Ex. II.)

Included in the assets transfered to the FDIC in its corporate capacity, by the FDIC-receiver, was a promissory note executed by Investment in favor of NOB in the amount of $700,307.40. ('77 Ex. 8.) The promissory note arose out of a loan made by NOB to Investment in the amount of $500,000 on August 9, 1974 and was secured by a security agreement which granted NOB a secured interest in all of Investment's inventory, equipment, fixtures and accounts receivable. ('77 Ex. 9.)[5] This is the promissory note which forms the basis for the complaint in the present lawsuit in that part of the collateral assigned to NOB to support said note was a five year lease between Investment, as lessor, and F & T as lessee, which leased to F & T a large quantity of machinery and equipment largely used by F & T and the receiver in the construction of the Old Orchard by the Bay project.

Plaintiff, FDIC, by this suit seeks to enforce the payment terms of the leasing agreement ('77 Ex. 9). Total rent set out in the lease is $397,500.00 payable monthly at the rate of $6,625.00. FDIC in its corporate capacity brings suit as assignee of FDIC in its receivership capacity.

On February 19, 1975, the FDIC-receiver notified Old Orchard that the letters of credit mentioned above had been terminated and that the termination would be effective as of the day of the closing of NOB, February 14, 1975. In a letter dated February 28, 1975, legal counsel for Old Orchard made a demand upon the FDIC to release the mortgaged real estate which served as collateral for the letters of credit so that it could be used as security for the construction mortgage with Advance or some other lender.

Advance had terminated the construction draws as a result of the termination of the letters of credit and no other form of security had been provided by Old Orchard. Almost simultaneously with the cessation of construction draws, the Old Orchard by the Bay project came to a complete standstill,

---

5. Although the amount loaned was $500,000, with prepaid interest and miscellaneous charges and fees, the total amount owed to NOB was $700,307.40.

resulting in several of the subcontractors filing mechanic's liens against Old Orchard as the title holder to the property on which the project was being constructed. Consequently, on March 5, 1975, F & T filed a petition under Chapter XI of the Bankruptcy Act in this Court to prevent further lien encumberances and to seek the appointment of an operating receiver with the capability to arrange alternative financing. It is the receiver, David A. Cuvrell, who has brought the counter-claim in the present lawsuit against the FDIC in its corporate capacity based on the breach of contract for the allegedly wrongful termination of the letters of credit and unreasonable delay in releasing the mortgaged real estate.

Shortly after his appointment, Mr. Cuvrell assumed the construction agreement between F & T and Old Orchard and obtained alternative security arrangements in order to reinstate the construction mortgage and the draws received therefrom. In pertinent part, the alternative financing arrangement consisted of converting a fourth letter of credit which was established with another bank into a certificate of deposit in the approximate amount of $550,000 and assigning the released portion of this certificate of deposit as a security for the operating deficit fund which had previously been secured by one of the letters of credit issued by NOB, but terminated by the FDIC. This was deemed to be acceptable by HUD as the mortgage insurer, and consequently, construction draws were thereafter authorized by Advance. Construction activities recommenced and the Old Orchard by the Bay project was ultimately completed 114 days behind schedule. Prior to the cancellation of the letters of credit by the FDIC-receiver, on the other hand, the record indicates that F & T was approximately three months ahead of schedule on the Old Orchard by the Bay project ('81 Ex. 16).

*The Complaint*

On February 9, 1976, the FDIC acting in its corporate capacity filed a complaint in this Court against Mr. Cuvrell, the receiver, F & T and Investment for the turnover of the collateral which partially secured the promissory note executed by Investment and leased to F & T. The lease of the machinery and equipment from Investment to F & T is dated September 5, 1974 and incorporated in an assignment of lease dated September 10, 1974 with NOB named as assignee. ('77 Ex. 9.) The assignment of lease was used as partial collateral by Investment to secure the promissory note in favor of NOB dated August 9, 1974, which was purchased by the FDIC in its corporate capacity as part of the "unacceptable assets" of NOB. The monthly payments under the assignment were in the amount of $6,625 payable by F & T to Investment.

During the pendancy of the Chapter XI proceedings, the operating receiver, Mr. Cuvrell, continued to operate the construction business of F & T, and out of necessity, continued to use and operate the machinery and equipment which was subject to the assignment of lease. The machinery and equipment was used for the completion of the Old Orchard by the Bay project, as well as other construction projects. It is clear from the testimony adduced at trial, that at no time during the pendancy of the Chapter XI proceedings was the lease either accepted or rejected as an executory contract by the receiver of F & T. Therefore, it is the claim of the FDIC in its corporate capacity that it is entitled to recover from the bankruptcy estate the sum of $6,625.00 per month for each month the receiver used the machinery and equipment. It is likewise clear, that the Chapter XI proceedings continued for a total of twenty-three (23) months and that F & T was adjudicated a bankrupt on February 11, 1977. The actual pieces of machinery and equipment were surrendered to a prior secured party who took possession of them sometime in May of 1977. No payments have been made to either NOB or the FDIC for the use of the equipment during the Chapter XI proceedings.

*The Counter-Complaint*

On August 24, 1978, the operating receiver for F & T, Mr. Cuvrell, filed a counter-complaint against the FDIC which sought damages from the FDIC for the breach of

contract allegedly caused by the FDIC in terminating the letters of credit and unduly delaying the return of the collateral which secured the letters of credit. In addition, the counter-complaint alleged that the FDIC did not abide by its statutorily imposed duty to ratably distribute the proceeds of the liquidation of NOB to creditors. The counter-complaint was amended on February 2, 1979 to include the FDIC as the receiver of NOB as a counter-defendant.

The theory of liability presented in support of the counter-complaint is that the FDIC, acting in its receivership capacity, became liable to the bankrupt when it terminated the letters of credit and wrongfully withheld the release of the collateral. In order to extend this liability to the FDIC, acting in its corporate capacity, it is the claim of the operating receiver, Mr. Cuvrell, that when the FDIC-receiver sold the "unacceptable assets" to the FDIC in its corporate capacity, that there was a corresponding assumption of liabilities as well.

The FDIC has raised several defenses and objections to the relief sought by the receiver on the behalf of the bankrupt. The primary grounds for the FDIC's position are: (1) an objection to this Court's jurisdiction to hear the counter-claim, (2) a claim that the bankrupt has no standing to sue under the letters of credit because it was not the named customer on the letters of credit and (3) the assertion that the FDIC, acting in its corporate capacity, did not assume any of the liabilities of the FDIC-receiver. In essence, the FDIC's position is that this Court lacks subject matter jurisdiction over the FDIC-receiver, and even if subject matter jurisdiction is found to exist, the FDIC is not liable because the bankrupt does not have standing to sue under the letters of credit and the FDIC in its corporate capacity never assumed liability on the part of the FDIC-receiver. The FDIC also disputes the operating receiver's claim for damages.

*Issues Presented*

The issues presented for the Court's determination are as follows:

1. Whether the operating receiver for the bankrupt is liable to the FDIC for the use of the leased equipment during the pendency of the Chapter XI proceedings, and if so, a determination of the amount of damages owing to the FDIC as an expense of administration.

2. Whether this Court has subject matter jurisdiction over the FDIC to determine the extent of liability, if any, against either the FDIC-receiver or the FDIC in its corporate capacity.

3. Whether the bankrupt has standing to sue for damages resulting from the termination of the letters of credit and the retention of the collateral.

4. Does the counter-complaint state a cause of action in tort or contract or both?

5. If the FDIC is liable, then the Court must determine the amount of damages owing from the FDIC to the bankruptcy estate.

*Discussion of Law*

A. Liability for Administrative Expenses:

■ There are three different sections in the Bankruptcy Act which relate to the assumption or rejection of executory contracts and unexpired leases. Section 70(b) of the Bankruptcy Act is applicable to Chapter VII proceedings and states in pertinent part:

The trustee shall assume or reject an executory contract, including an unexpired lease of real property, within sixty days after the adjudication or within thirty days after the qualification of the trustee, whichever is later, but the court may for cause shown extend or reduce the time. Any such contract or lease not assumed or rejected within that time shall be deemed to be rejected. 11 U.S.C. § 110(b).

With respect to Chapter XI proceedings, however, the applicable section of the Bankruptcy Act is section 378(b) which states in its entirety:

Any contract which is entered into or assumed by a debtor in possession, receiver, or trustee in a proceeding under this chapter and which is executory in whole or in part at the time of the entry of an order directing that bankruptcy be proceeded with shall be deemed to be rejected unless expressly assumed within sixty days after the entry of such order or the qualification of the trustee in bankruptcy, whichever is the later, but the court may for cause shown extend or reduce the time. When a contract entered into or assumed in a superseded proceeding is rejected, the resulting liability shall constitute a cost of administration of the superseded proceeding. 11 U.S.C. § 778(b).

Each of the above quoted sections of the Bankruptcy Act were carried forward in the Rules of Bankruptcy Procedure when they were promulgated by an order of the United States Supreme Court in 1972. For example, Bankruptcy Rule 607 parallels section 70(b) of the Bankruptcy Act and is applicable only to Chapter VII proceedings. It states in its entirety:

Within 30 days after the qualification of the trustee, unless the court for cause shown extends or reduces the time, the trustee shall file a statement showing any executory contracts of the bankrupt, including unexpired leases, which the trustee has assumed. Whenever practicable, the trustee shall obtain approval of the court before he assumes a contract. Any such contract not assumed within 60 days after qualification of the trustee, or within such further or reduced time as the court may allow within such 60-day period, shall be deemed to be rejected. If a trustee does not qualify, any such contract shall be deemed to be rejected at the expiration of 60 days after the date of an order directing that a trustee be not appointed, or at such earlier or later time as the court may fix within such 60-day period. On application by the trustee for authority to assign any contract he has assumed pursuant to this rule, the court shall determine the matter after hearing on notice to the other party to the contract.

Although it is clear under section 70(b) of the Bankruptcy Act and Bankruptcy Rule 607 that the trustee in a Chapter VII proceeding must assume an executory contract or unexpired lease within 60 days after qualification, or else the contract is deemed to be rejected, such is not the case in a Chapter XI proceeding. The applicable Bankruptcy Rule, Rule 11-53, contemplates court action before an executory contract may be accepted or rejected:

When a motion is made for the rejection of an executory contract, including an unexpired lease, other than as part of the plan, the court shall set a hearing on notice to the parties to the contract and to such other persons as the court may direct.

In addition, counsel for the receiver has persuasively argued to this Court that an operating receiver appointed during a Chapter XI proceeding is not under an affirmative duty to either accept or reject an executory contract. Under section 313 of the Bankruptcy Act a receiver, and any other party in interest for that matter, may petition the bankruptcy court to reject an executory contract. In this respect, the lessor is not bound to wait for the receiver to act, but may act itself by initiating a court hearing. Section 313(1) states in its entirety:

Upon the filing of a petition, the court may, in addition to the jurisdiction, powers, and duties hereinabove and elsewhere in this chapter conferred and imposed upon it—

(1) permit the rejection of executory contracts of the debtor, upon notice to the parties to such contracts and to such other parties in interest as the court may designate... 11 U.S.C. § 713(1).

In the case of *In re Alfar Dairy, Inc.*, 458 F.2d 1258 (5th Cir. 1972), cert. denied 409 U.S. 1048, 93 S.Ct. 517, 34 L.Ed.2d 501 (1972) the court succinctly set forth the procedures under which an executory contract may be rejected in a Chapter XI proceeding. The court stated therein as follows:

The bankruptcy act provides two (2) methods by which the rejection of executory [contracts] of a chapter XI debtor may be made. These two methods are as follows:

a. Sec. 313(1) permits the rejection upon notice to the parties to such contracts, and

b. By providing for the rejection of such contracts in the Plan of Arrangement itself pursuant to Sec. 357(2). *Id.* at 1260.

Since the lease which forms the basis for the complaint in the present lawsuit was not rejected by the receiver during the pendency of the Chapter XI proceeding, it would appear reasonable to conclude that the receiver remained liable in damages for his continued use of the machinery and equipment. Indeed, this is precisely the conclusion reached by the authors of *Collier on Bankruptcy* when they state:

It has been held that when in the absence of such legitimate termination prior to bankruptcy of the lessee, and subsequently to bankruptcy a receiver occupies the leased premises, the receiver succeeds to the 'right' of the bankrupt to enjoy this peculiar possession at sufferance, without having to pay for use and occupation for this 'term at sufferance' as an expense of preserving the estate. Under this view the receiver can be surcharged if he pays for use and occupancy for this term at sufferance. The better view, however, looks with disfavor upon this kind of sponging on the landlord and requires payment as cost of administration of the *pro rata* rent due for the time of occupancy by the court's officer.

The *quantum* of allowance for use and occupation by the receiver or trustee is measured by 'the reasonable value of such use and enjoyment.' Ordinarily this will be the contractual rental *pro rata temporis*, unless it is shown that the contractual rental itself is clearly unreasonable. There is a presumption to the effect that the contractually reserved rent is reasonable. The effect of any price control legislation must be considered. It

is always advisable for both the officer and the lessor to make, with permission of the court, some express arrangement according to the use the officer wishes to make of the premises. Otherwise, it might happen that the court in a proper case will measure the value not so much by what it is reasonably worth on the real estate market, but by the benefit which the estate derived. (Footnotes omitted.) 3A *Collier on Bankruptcy*, ¶ 62.14, at pp. 1515–17 (14th Ed.).

The vast majority of courts which have considered this question have consistently ruled in favor of the lessor, holding the receiver or trustee liable in damages for the use of leased property. For example, in *Green v. Finnigan Realty Co.*, 70 F.2d 465 (5th Cir. 1934) a receiver remained in possession of real property which had been leased to the bankrupt and the lessor did not object to the receiver's occupancy; however, the lessor did petition the bankruptcy court for the allowance of an administrative claim for rent which the receiver did not pay. In determining the appropriate measure of damages the Court of Appeals for the Fifth Circuit stated:

The receiver like any other trespasser becomes liable to pay the reasonable worth of the premises for occupancy, whether more or less than the rent under the lease, together with any special damages occasioned by his detention of them. The rate of rental fixed by the disclaimed lease is presumably reasonable, but it is not conclusively so.... We think, moreover, in this case that the fair inference of fact is that Finnigan Realty Company did not demand possession because it did not wish a vacant building and preferred that the trustee should occupy it subject to its contention about the amount of rent to be paid. If there was consent, express or implied, to the trustee's occupancy, there arose as to him a new tenancy at will or by sufferance at an implied reasonable rent, and not a tenancy by holding over under the old lease at the rental fixed by it. *Id.* at 467.

*See also In re First Research Corporation*, 457 F.2d 331 (5th Cir. 1972) and *In re Millard's, Inc.*, 41 F.2d 498 (7th Cir. 1930).

Of the numerous judicial decisions this Court has reviewed in considering the plaintiff's claim for administrative expenses, two cases deserve special comment. The first is *In re Universal Medical Services, Inc.*, 357 F.Supp. 1137 (E.D.Penn.1973) wherein the court was specifically requested to reconsider the decision rendered in *In re Celian*, 41 F.2d 560 (E.D.Penn.1930). For more than forty years the *Celian* decision stood for the dubious distinction of being the only reported decision to hold that a lessor could only recover as an administrative expense rent which became due and payable after the appointment and occupancy of a receiver or trustee in bankruptcy. After an exhaustive review of the cases decided after *Celian*, the court concluded:

> The rights and priorities of creditors are determined as of the date of the filing of the petition in bankruptcy, *United States v. Marxen*, 307 U.S. 200, 59 S.Ct. 811, 83 L.Ed. 1222 (1939); *Sexton v. Dreyfus*, 219 U.S. 339, 31 S.Ct. 256, 55 L.Ed. 244 (1911); *In re Van Horn*, 246 F. 822 (3rd Cir. 1917); *Stolzenbach v. Penn-American Gas Coal Co.*, 295 F. 628 (3rd Cir. 1924). However, permitting the lessor to apportion the rent and recover the fair rental value as a cost of administration for the use of his premises by the receiver, trustee, or other officer of the Court, is not inconsistent with the aforementioned cases. This right is clearly within the ambit of the plain meaning of Section 64(a)(1) of the Bankruptcy Act in that subsequent to the filing of the petition the payment of rent is an actual and necessary cost incurred in preserving the bankrupt's estate and therefore it should be regarded as an administration expense. *In re Universal Medical Services, Inc., supra*, at 1144. *See also In re J. Bain, Inc.*, 554 F.2d 255 (5th Cir. 1977).

The other case which merits special comment is *In the Matter of Midtown Skating Corporation*, 3 B.R. 194 (Bkrtcy.S.D.N.Y. 1980) wherein the Honorable Roy Babitt was presented with the question of whether a Chapter XI debtor should be allowed to continue as a tenant of real property, and if so, the amount of rent which should be paid to the lessor. Although the *Midtown* case is different from the matter presently at issue in the current lawsuit, the result reached by Judge Babitt appears to be in accord with the great weight of authority. To quote his exact words:

> The fact that the debtor has asked this court to fix use and occupancy does not mean that if the lease is not rejected it will lose its contractual vitality once the debtor can confirm a plan and emerge from this court rehabilitated. *To the contrary, use and occupancy relates only to the Chapter XI period during which the lease is neither assumed nor rejected.* *Philadelphia Co. v. Dipple*, 312 U.S. 168, 61 S.Ct. 538, 85 L.Ed. 651 (1941); *Palmer v. Palmer*, 104 F.2d 161 (2d Cir. 1939), cert. den. 308 U.S. 590, 60 S.Ct. 120, 84 L.Ed. 494 (1939). If the debtor decides to assume, during its Chapter XI case, it will be under the obligation to pay the reserved rent from the filing of the petition until assumption and thereafter, and if the use and occupation fixed by this court pending such assumption is less than the rent reserved, the difference must be made up. (Emphasis added.) *Id.* at 198. *See also Texas Importing Co. v. Banco Popular de Puerto Rico*, 360 F.2d 582 (5th Cir. 1966).

Counsel for the receiver has consistently argued that the receiver is only liable for the "fair value" of the use and benefit of the equipment and machinery used to complete construction projects by the receiver. Concededly, there is support for such a position under appropriate circumstances, and this Court has found authority to support the receiver's position. For example, in the case of *In the Matter of Vescio's, Inc.*, 2 B.C.D. 1015 (E.D.Mich.1976), a Chapter XI case filed in this Court, the receiver was sued by a landlord for the lease rental payments set by the written lease which the bankrupt had abandoned and tendered back to the landlord. However, some equipment and fixtures remained in the building which belonged to the bankrupt for several months after the bankrupt ceased doing business at that location, which was one of

several abandoned by the bankrupt. Adopting the reasoning expressed by the Court of Appeals for the Fifth Circuit in the case of *Texas Importing Co. v. Banco Popular de Porta Rico*, 360 F.2d 582 (5th Cir. 1966), this Court fixed the fair rental value for the use of the premises, using expert testimony as a basis, at a rate less than the figure stated in the lease.[6]

The conclusion is inescapable, based upon the above quoted sections of the Bankruptcy Act and applicable cases, that under the facts presented, the receiver is liable to the plaintiff for damages for his failure to pay for the machinery and equipment he used during the pendency of the Chapter XI proceeding. The testimony and documentary evidence adduced at trial clearly illustrates that the receiver was appointed on March 5, 1975, and continued using the machinery and equipment until the bankrupt was adjudicated on February 11, 1977. For that twenty-three month period of time, the receiver made no payments to the plaintiff. Under the terms of the lease, which was neither affirmatively accepted nor rejected by the receiver during the pendency of the Chapter XI, the bankruptcy estate was obliged to pay $6,625 per month as rent for the use of the machinery and equipment.

The only testimony received with respect to whether or not the payments called for by the lease were "reasonable" came in the form of a question from counsel for the plaintiff on cross examination of the receiver when he asked whether the receiver considered the $6,625 figure to be "reasonable." [7] The receiver answered in the affirmative and the attorney for the receiver made no objection to this testimony.

■ This Court will take judicial notice that the business background of the receiver qualifies him to express a valid opinion as to the rental value of the equipment to the estate. There being no other evidence, other than the lease itself, as to value, the receiver's testimony is binding on the Court. Therefore, it is the holding of this Court that the plaintiff is entitled to an administrative expense of $6,625 per month for the twenty-three months during which the bankrupt was involved in Chapter XI, which equals a total amount of $152,375. The claim shall be accorded a first priority of administration which is in conformity with section 64(a)(1) of the Bankruptcy Act.

**B. Jurisdiction to Determine Counter-Claim:**

■ The FDIC-receiver has vigorously opposed this Court's exercise of jurisdiction over the counter-complaint filed against it on behalf of the bankrupt. In fact, the FDIC-receiver filed a motion for summary judgment on its assertion that this Court lacked subject matter jurisdiction over the counter-complaint. After hearing oral arguments and reviewing the memorandum briefs submitted by the parties on the subject of jurisdiction, this Court entered a Memorandum Opinion and Order denying the motion for summary judgment on April 10, 1980. At that time, it was the opinion of this Court that the counter-complaint should be allowed to proceed to trial. In reaching that conclusion, this Court stated:

> The more serious question, however, concerns the attempt of the FDIC to enforce the security interest leases and at the same time deny the bankrupt the right to assert any defense to the claim. The FDIC posits that, as Receiver of a failed state bank, it can take over assets belonging to the bankrupt, transfer these assets back to itself, in either its Corporate ca-

---

6. *See also In the Matter of Frimberger Corporation*, File No. 71–8154, *unpublished opinion* (E.D.Mich.1974), *aff'd mem.* dated May 20, 1976 (6th Cir.) wherein this Court also addressed the issue of executory contracts in Chapter XI proceedings and came to the same conclusion as in the *Vescio's* case; i.e., there must be affirmative action taken in order to force a receiver to either assume or reject an executory contract.

7. It should be noted that the factual circumstances and testimony received in the present lawsuit were much different from those in the *Vescio's* and *Frimberger* decisions. In the present case, since the operating receiver admitted that the rental payments designated in the lease were "reasonable," this Court has no basis for a contrary result.

pacity or in its capacity as Receiver, attempt to realize upon these assets by suing the bankrupt, and at the same time deny the bankrupt the right to assert any defenses to the claim by way of counter-complaint. The court has some difficulty in accepting this view. In raising the defense that it cannot be sued for its action because the bankrupt should pursue the Receiver or liquidator, an entity that appears to be a straw man without assets, the plaintiff FDIC would deprive the bankrupt defendant the right to raise a defense cognizable at law. The FDIC would relegate the bankrupt to a suit in an Ohio court on issues inextricably bound in the facts presented to this court. The court believes that such an approach is unduly dogmatic in placing form over substance and would operate to deny due process to the bankrupt. *Memorandum Opinion*, J. Bobier (April 10, 1980) at pp. 997–998 (copy attached).

Since the FDIC-receiver has continued to raise the jurisdictional question, this Court feels obliged to address the issue again. In doing so, however, reference should be made to this Court's prior written opinion, a copy of which is attached and labeled Appendix.

The key to understanding the jurisdictional objection raised by the FDIC-receiver is recognition of the fact that the FDIC is authorized by statute to act both as the receiver of a failed national bank and in its capacity as a separate corporate entity. The statutory provisions which authorize the FDIC to act in these dual capacities are sections 1821(e) and 1823(d), (e) of title 12 of the United States Code. Although the FDIC-receiver has cited several leading cases which recognize and apply the legal fiction created by the statutes, it is not necessary to reiterate the basic tenets of this area of the law because there has never been a dispute as to the FDIC's ability to act in dual capacities. Where the dispute does arise, however, is when the FDIC-receiver argues that exclusive jurisdiction over its affairs as liquidator of NOB is vested in the Cuyahoga County Court by an order of that court dated February 17, 1975.

In other words, the FDIC-receiver takes the position that any effort to collect a money judgment against the FDIC-receiver must be brought in the Ohio court.[8] While this argument may be pursuasive in a state court or a federal district court, it fails to recognize the exclusive jurisdiction of the bankruptcy court to determine and liquidate any and all claims of the bankrupt's estate pursuant to section 2 of the Bankruptcy Act. Section 2 of the Bankruptcy Act reads in pertinent part as follows:

Cause the estates of bankrupts to be collected, reduced to money, and distributed, and determine controversies in relation

**8.** The exclusivity of this procedural remedy is matched only by the ancient canard poked at the Bostonians where it was alleged that "the Lodges spoke only to the Cabots, and the Cabots spoke only to God." A review of the statutory provisions relating to the FDIC, 12 U.S.C. § 1811 *et seq.*, appears to disclose a substantially autonomous and monolithic bureaucracy. No procedural mechanisms are provided for any notice to creditors of a defunct bank, no notice to interested parties for liquidating assets, no creditor participation in determining priorities or distribution, no final accounting or notice thereof to creditors for the determination and allowance of costs, fees and disbursements; in essence, a total lack of accountability on the part of the FDIC, with a resulting paucity of procedural due process considerations afforded to the creditors of a failed bank. In fact, not only is the FDIC-receiver a "straw man" without assets in the truest sense of the word, but the statutory provisions allow for the FDIC in its corporate capacity to pay for the costs and fees incurred by the FDIC-receiver and specifically exempts the FDIC from any bonding requirements. *See* 12 U.S.C. § 1822(a). It is the opinion of this Court that at a minimum, in winding up the affairs of a defunct bank, the FDIC should be required to give adequate notice to creditors of its proposed method of liquidation and conduct a public hearing on a final accounting of the costs and fees incurred and the distributions made by the FDIC. This would allow a court, all creditors and other parties in interest an opportunity to scrutinize the disposition of assets and review the expenses and fees of administration. Under the present procedures, however, a foray against the FDIC on the part of a creditor would seem as frustrating as attacking an elephant with a jackstraw. It would appear that, as to accessability and accountability of the FDIC, action by the Congress is indicated.

thereto, except as herein otherwise provided, and determine and liquidate all inchoate or vested interests of the bankrupt's spouse in the property of any estate whenever, under the applicable laws of the State, creditors are empowered to compel such spouse to accept a money satisfaction for such interest; and where in a controversy arising in a proceeding under this Act an adverse party does not interpose objection to the summary jurisdiction of the court of bankruptcy, by answer or motion filed before the expiration of the time prescribed by law or rule of court or fixed or extended by order of court for the filing of an answer to the petition, motion or other pleading to which he is adverse, he shall be deemed to have consented to such jurisdiction...

  \*  \*  \*  \*  \*  \*

Make such orders, issue such process, and enter such judgments, in addition to those specifically provided for, as may be necessary for the enforcement of the provisions of this Act.... 11 U.S.C. §§ 11(a)(7) and (15).

In essence, sections 2 and 23 of the Bankruptcy Act confer two different grants of jurisdiction within the bankruptcy courts. The first is the exclusive jurisdiction to determine and liquidate claims which are within the actual or constructive possession of the trustee. The second is non-exclusive jurisdiction and differs from the former in that there is a lack of possession on the part of the trustee.[9] In commenting upon the bankruptcy court's jurisdiction, the authors of *Collier on Bankruptcy* state in pertinent part as follows:

> Sections 2 and 23 together confer two distinct classes of jurisdiction:
>
> (1) jurisdiction upon a federal district court as a court of bankruptcy over the proceedings in bankruptcy, initiated by the petition and ending in the distribution of assets among the creditors, the discharge of, or refusal to discharge, the bankrupt, and the closing of the estate;
>
> (2) jurisdiction upon a federal district court, sitting as a bankruptcy court, to set aside preferential transfers under § 60, and to set aside fraudulent transfers under §§ 67 and 70; and upon a federal district court, sitting as a court of law or equity, of controversies at law or in equity, as distinguished from proceedings under the Act.
>
> The first class of jurisdiction possessed by such courts is summary and exclusive. It includes the power to adjudicate as to bankruptcy, and, after adjudication, to administer the bankrupt's estate. Once acquiring proper possession of the bankrupt's property, the court is vested with exclusive jurisdiction, within the limits prescribed by the Bankruptcy Act, to determine all liens and interests affecting the estate, and to prevent, by proper or-

9. It should be noted that under the facts of the present case, this Court would have jurisdiction under either section 2 or section 23 of the Bankruptcy Act. Since section 2 is the more direct approach, as discussed in the body of this opinion, it is being used to form the basis for this Court's exercise of jurisdiction. However, reference should also be made to the following language:

> It should be emphasized at the outset that the power of a bankruptcy court to act summarily regarding controversies over property in its actual or constructive possession, and proceedings arising in the course of administration, is not in any way restricted by the terms of § 23. As will be seen later, this section relates chiefly to the jurisdiction of the district courts (sitting as district courts at law or in equity, or as bankruptcy courts) over plenary actions, although the provisions in § 23b may operate to allow a bankruptcy

court to exercise summary jurisdiction where it might not otherwise exist.

> Section 23 expressly recognizes and maintains the distinction between independent plenary suits that can be said to be 'controversies at law and in equity', and 'proceedings' in bankruptcy. In § 23, the term 'proceedings under this Act' appears to embrace both controversies arising in the bankruptcy proceedings, as well as the bankruptcy proceedings proper, and 'sets them both over against plenary suits between trustees (or receivers) and adverse claimants (instituted by bill or complaint, with subpoena or summons), touching rights or property not in the custody of the court.' Nor does § 23 in any way 'restrict the right of trustees or receivers to protect their possession through bankruptcy proceedings.' (Footnotes omitted.) 2 *Collier on Bankruptcy*, § 23.03 at pp. 443–445 (14th Ed.).

ders, the doing of anything that will, at any stage of the proceeding, tend to embarrass the court in the equitable distribution of the estate of the bankrupt. Thus a proceeding to determine the right to property in the possession of the bankruptcy court is summary. Also under § 67a(4), as discussed in ¶ 67.18, *infra*, a proceeding to hear and determine the rights of parties relative to liens obtained through legal or equitable proceedings within four months of bankruptcy is summary. The bankruptcy court, as before indicated, has exclusive jurisdiction of *summary proceedings*. (Emphasis in original and footnotes omitted.) 1 *Collier on Bankruptcy*, § 2.06 at pp. 152–158 (14th Ed.).

Another method by which the bankruptcy court can obtain jurisdiction is by waiver of the jurisdictional defect pursuant to Rule 915 of the Rules of Bankruptcy Procedure. It must be kept in mind that it was the FDIC itself who initiated the present lawsuit when it filed a complaint to liquidate its claim under the promissory note which was secured by the equipment and machinery. The fact that this lawsuit proceeded without any issue concerning this Court's jurisdiction for more than two years has been held by various courts to confer jurisdiction. *See Coffman v. Cobra Manufacturing Company*, 214 F.2d 489 (9th Cir. 1954), *cert. den.*, 348 U.S. 912, 75 S.Ct. 291, 99 L.Ed. 715, *reh. den.*, 348 U.S. 956, 75 S.Ct. 436, 99 L.Ed. 747; *Baker v. National City Bank of Cleveland*, 387 F.Supp. 1137

(N.D.Ohio 1974), *aff'd.* 511 F.2d 1016 (6th Cir. 1975).[10]

The jurisdiction of the bankruptcy courts was the subject of much debate and litigation under the Bankruptcy Act. The difficulty in this area of bankruptcy law is further compounded by the fact that the bankruptcy court's jurisdiction is different in a corporate reorganization proceeding than in a straight bankruptcy. *Williams v. Austrian*, 331 U.S. 642, 67 S.Ct. 1443, 91 L.Ed. 1718 (1947). For example, in the oft-cited case of *Isaacs v. Hobbs Tie & Lumber Co.*, 282 U.S. 734, 51 S.Ct. 270, 75 L.Ed. 645 (1931), the United States Supreme Court commented upon the jurisdiction of the bankruptcy courts as follows:

Upon adjudication, title to the bankrupt's property vests in the trustee with actual or constructive possession, and is placed in the custody of the bankruptcy court. *Mueller v. Nugent*, 184 U.S. 1, 14, 22 S.Ct. 269 [274], 46 L.Ed. 405, 411. The title and right to possession of all property owned and possessed by the bankrupt vests in the trustee as of the date of the filing of the petition in bankruptcy, no matter whether situated within or without the district in which the court sits. *Robertson v. Howard*, 229 U.S. 254, 259, 260, 33 S.Ct. 854 [855, 856], 57 L.Ed. 1174, 1177; *T. E. Wells & Co. v. Sharp*, 125 C.C.A. 609, 208 Fed. 393; *Galbraith v. Robson-Hilliard Grocery Co.* 133 C.C.A. 46, 216 Fed. 842, 32 Am.Bankr.Rep. 752. It follows that the bankruptcy court has exclusive jurisdiction to deal with the property of the bankrupt estate. It may order a

---

**10.** *See also Katchen v. Landy*, 382 U.S. 323, 86 S.Ct. 467, 15 L.Ed.2d 391 (1966) wherein the United States Supreme Court cited with approval its earlier decision in *Alexander v. Hillman*, 296 U.S. 222, 56 S.Ct. 204, 80 L.Ed. 192 (1935) concerning the jurisdiction of the bankruptcy courts:

What we said in *Alexander v. Hillman*, 296 U.S. 222, 56 S.Ct. 204, 80 L.Ed. 192, in connection with the jurisdiction of a receivership court to entertain a counterclaim against a claimant in the receivership proceeding, is equally applicable here:

"By presenting their claims respondents subjected themselves to all the consequences that attach to an appearance . . . . .

"Respondents" contention means that, while invoking the court's jurisdiction to establish their right to participate in the distribution, they may deny its power to require them to account for what they misappropriated. In behalf of creditors and stockholders, the receivers reasonably may insist that, before taking aught, respondents may by the receivership court be required to make restitution. That requirement is in harmony with the rule generally followed by courts of equity that having jurisdiction of the parties to controversies brought before them, they will decide all matters in dispute and decree complete relief. *Katchen v. Landy, supra*, 382 U.S. at 335, 86 S.Ct. at 475.

sale of real estate lying outside the district. *Robertson v. Howard,* 229 U.S. 254, 259, 260, 33 S.Ct. 854 [855, 856], 57 L.Ed. 1174, 1177, supra; *Re Wilka* (D.C.) 131 Fed. 1004. *When this jurisdiction has attached the court's possession cannot be affected by actions brought in other courts. White v. Schloerb,* 178 U.S. 542, 20 S.Ct. 1007, 44 L.Ed. 1183; *Murphy v. John Hofman Co.,* 211 U.S. 562, 29 S.Ct. 154, 53 L.Ed. 327; *Dayton v. Stanard,* 241 U.S. 588, 36 S.Ct. 695, 60 L.Ed. 1190. This is but an application of the well recognized rule that when a court of competent jurisdiction takes possession of property through its officers, this withdraws the property from the jurisdiction of all other courts which, though of concurrent jurisdiction, may not disturb that possession; and that the court originally acquiring jurisdiction is competent to hear and determine all questions respecting title, possession and control of the property. *Murphy v. John Hofman Co.,* 211 U.S. 562, 29 S.Ct. 154, 53 L.Ed. 327, *supra; Wabash R. Co. v. Adelbert College,* 208 U.S. 38, 28 S.Ct. 182, 52 L.Ed. 379; *Harkin v. Brundage,* 276 U.S. 36, 48 S.Ct. 268, 72 L.Ed. 457. (Emphasis added.) *Id.* at 737–738, 51 S.Ct. at 271–272.

Clearly, this Court has summary jurisdiction to determine the contract claim presented by the FDIC in its corporate capacity. Likewise, it is clear that this Court has the actual or constructive possession of the assets in question; namely, the equipment and machinery which was used to secure the promissory note, as well as the chose in action being asserted by the receiver and liquidating trustee of the bankrupt corporation. Under such circumstances, the bankruptcy court has summary jurisdiction to proceed to determine all issues with respect to the property under the aegis and control of the bankruptcy court. *See Harrison v. Chamberlain,* 271 U.S. 191, 46 S.Ct. 467, 70 L.Ed. 897 (1926); *In re Lehigh Valley RR Co.,* 458 F.2d 1041 (3rd Cir. 1972); *In re Roman,* 23 F.2d 556 (2nd Cir. 1928). In other words, the jurisdictional objection raised by the FDIC does not rise to the level of those cases where the courts have been reluctant to assert summary jurisdiction in that the present lawsuit involves assets which are in the actual or constructive possession of the trustee. Even if this were not true, however, the Court of Appeals for the Sixth Circuit has consistently held in favor of the exercise of summary jurisdiction under such circumstances. For example, in the case of *In re Wiltse Brothers Corp.,* 357 F.2d 190 (6th Cir. 1966), the Court of Appeals for the Sixth Circuit stated the general rule as follows:

> This is a case where the Bankruptcy Court asserts summary jurisdiction over property which is not physically within the possession of the bankrupt. General principles establish that where the actual or constructive possession is in a third person, the Bankruptcy Court only has jurisdiction when it determines that the property is not held under a substantial adverse claim. A substantial adverse claim exists when the third person asserts a legal right to the property. Where the legal right asserted does not involve some fair or reasonable doubt of fact or law, as to be without color or merit, then the Bankruptcy Court has jurisdiction to deal with the property. The Bankruptcy Court has power to make a preliminary inquiry to determine whether the adverse claim is substantial or merely colorable. 2 Collier on Bankruptcy, Section 23.05; *Thompson v. Magnolia Petroleum Co.,* 309 U.S. 478, 60 S.Ct. 628, 84 L.Ed. 876 (1940); *Harrison v. Chamberlin,* 271 U.S. 191, 46 S.Ct. 467, 70 L.Ed. 897 (1926); *May v. Henderson,* 268 U.S. 111, 45 S.Ct. 456, 69 L.Ed. 870 (1925); *In Re Kansas City Journal-Post Co.,* 144 F.2d 812 (C.A.8, 1944); and *American Mannex Corporation v. Huffstutler,* 329 F.2d 449 (C.A.5, 1964).

> Where a debt is owed the bankrupt, such intangible may be in the constructive possession of the Bankruptcy Court if the bankrupt remained the legal owner up to the time of filing the petition. 2 Collier on Bankruptcy, Section 23.05, pg. 487. The bankrupt may have such possession of intangible property as to give the

Bankruptcy Court summary jurisdiction to determine which claimant is the proper obligee of a chose in action. *Orinoco Iron Co. v. Metzel*, 230 F. 40 (C.A.6, 1918); *In Re Borok*, 50 F.2d 75 (C.A.2, 1931). *Id.* at 192–193.

In addition to the above discussion concerning this Court's exercise of summary jurisdiction over the counter-claim against the FDIC-receiver, there are two major reasons why this Court should make a determination of all the claims and disputes raised by the parties to this lawsuit. The first reason is based on the undisputed facts that the FDIC-receiver terminated the letters of credit and that a proper demand was made for the release of the real estate which served as the security for the issuance of the letters of credit immediately upon their termination by the FDIC-receiver ('81 Ex. 18). The FDIC-receiver does not deny that it continued to hold the real estate, and thereby prevent the receiver in bankruptcy to use it as collateral to raise desperately needed money to finish the construction project, but argues that it offered to release that real estate upon the condition of obtaining a complete release for the termination of the letters of credit. (*See* '81 Ex. 19.) Therefore, none of the facts necessary to establish the existence of the breach of contract are either materially or substantially disputed by the FDIC-receiver. Furthermore, the documentary evidence and testimony presented by the FDIC at trial indicates that the defense raised by the FDIC to the counter-claim centered upon the question of damages caused by the breach of contract. Taken in this light the true nature of the dispute between the parties becomes clear; that is, the parties are attempting to liquidate their claims against each other. As such, this is a traditional situation in which the summary jurisdiction of the bankruptcy court should be invoked in order to settle the disputes arising between the parties.

The second major reason why this Court feels compelled to determine the extent of liability established under the counter-claim is based on the procedural necessities of compulsory counter-claims and necessary parties to a lawsuit. Reference has already been made by this Court in its Memorandum Opinion dated April 10, 1980, as to the necessity of the receiver for the bankrupt to bring the counter-claim under Rule 713 of the Rules of Bankruptcy Procedure, and accordingly, no further elaboration is necessary at this time. With respect to the necessity of the FDIC-receiver as a party defendant in this litigation, Rule 719 of the Rules of Bankruptcy Procedure controls and states in pertinent part as follows:

> A person who is subject to service of process shall be joined as a party in the proceeding if (1) *in his absence complete relief cannot be accorded among those already parties*, or (2) he claims an interest relating to the subject of the proceeding and is so situated that the disposition of the proceeding in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest. If he has not been so joined, the court shall order that he be made a party. If he should join as a plaintiff but refuses to do so, he may be made a defendant, or, in a proper case, an involuntary plaintiff.
>
> . . . .
>
> If a person as described in subdivision (a) hereof cannot be made a party, or if such a person is dismissed or the part of the proceeding involving his interest is transferred pursuant to subdivision (b) hereof, the court shall determine whether in equity and good conscience the proceeding should continue among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable. The factors to be considered by the court include: first, to what extent a judgment rendered in the person's absence might be prejudicial to him or those already parties; second, the extent to which, by protective provisions in the judgment, by shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in

the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the proceeding is dismissed for nonjoinder. (Emphasis added.)

It is not disputed that it was the FDIC-receiver who terminated the letters of credit and caused the delay in releasing the real estate which secured those letters of credit. The question is whether the FDIC-receiver is an "indispensible" party within the meaning of Rule 719. In the case of *Provident Bank & Trust Co. v. Patterson*, 390 U.S. 102, 88 S.Ct. 733, 19 L.Ed.2d 936 (1978), the United States Supreme Court stated the following as a guideline for the trial court's determination:

Whether a person is 'indispensable,' that is, whether a particular lawsuit must be dismissed in the absence of that person, can only be determined in the context of particular litigation. There is a large category, whose limits are not presently in question, of persons who, in the Rule's terminology should be 'joined if feasible,' and who, in the older terminology, were called either necessary or indispensable parties. Assuming the existence of a person who should be joined if feasible, the only further question arises when joinder is not possible and the court must decide whether to dismiss or to proceed without him. To use the familiar but confusing terminology, the decision to proceed is a decision that the absent person is merely 'necessary' while the decision to dismiss is a decision that he is 'indispensable.' The decision whether to dismiss (i.e., the decision whether the person missing is 'indispensable') must be based on factors vary-ing with the different cases, some such factors being substantive, some procedural, some compelling by themselves, and some subject to balancing against opposing interests. Rule 19 does not prevent the assertion of compelling substantive interests; it merely commands the courts to examine each controversy to make certain that the interests really exist. To say that a court 'must' dismiss in the absence of an indispensable party and that it 'cannot proceed' without him puts the matter in the wrong way around: a court does not know whether a particular person is 'indispensable' until it has examined the situation to determine whether it can proceed without him. (Footnotes omitted.) *Id.* at 118–119, 88 S.Ct. at 742–743.

The common thread throughout each procedural method of requiring the FDIC-receiver to be a party in this lawsuit is inextricably tied to the concept of judicial economy. The entire theory behind the summary jurisdiction of a bankruptcy court, as well as the notions of when a counter-claim is "compulsory" and whether a party is "necessary" or "indispensable," ultimately boils down to whether the interests of the parties, including all creditors of the estate, and of the Court will be best served by hearing and deciding all of the disputes between all of the parties. Therefore, it is the opinion of this Court that there exists summary jurisdiction to hear and decide the counter-complaint, which is compulsory in nature and that the FDIC-receiver has been properly added as a party defendant under Rule 719.[11] To hold otherwise would necessitate an unnecessary repetition of precious

---

11. It must be borne in mind that the procedural rule changes promulgated by the Supreme Court and approved by Congress in 1972 with respect to bankruptcy court procedure clearly illustrates that litigants in the bankruptcy courts are not bound by any procedural limitations formerly associated with summary jurisdiction. *See Morrison v. Rocco Ferrera & Co.*, 554 F.2d 290 (6th Cir. 1977), *cert. denied*, 434 U.S. 925, 98 S.Ct. 405, 54 L.Ed.2d 283 (1977). The full panoply of trial procedure provided by the Federal Rules of Civil Procedure is available to litigants, including trial by jury. *See In the Matter of Merrill*, 433 F.Supp. 455 (N.D. Ala.1977), *aff'd* 594 F.2d 1064 (5th Cir. 1979). For example, in preparation for trial in the instant case, the parties employed a motion for summary judgment, written interrogatories, trial depositions and pretrial conferences. The Rules of Bankruptcy Procedure, as amended, were designed to provide a full plenary trial to litigants in bankruptcy court, and to abolish the antiquated distinction between "summary" and "plenary" jurisdiction. Congress has further expressed such an intent when it enacted the new jurisdictional powers under 28 U.S.C. § 1471 to accompany the Bankruptcy Reform Act of 1978.

judicial time and would undoubtedly waste the time and money of all the parties in interest.[12]

C. Standing to Sue under the Letters of Credit:

■ The primary source of liability claimed by the trustee of F & T against the FDIC is for the cause of action which arose as a result of the termination of the letters of credit and resulting damages which accrued from the delay in releasing the real estate which was the collateral for those letters of credit. The FDIC denies any liability on its part owing to F & T because F & T was not a named "customer" on the letters of credit. There is no dispute as to the fact that F & T was not a named "customer" on the letters of credit. The trustee for F & T argues, however, that there exists three factual reasons why F & T should be entitled to sue under the letters of credit. They are: (1) the fact that F & T signed as a co-maker on the promissory notes given to NOB as collateral, (2) the fact that F & T was required to submit a detailed financial report of its economic affairs to NOB to prove its financial responsibility as a condition precedent to the issuance of the letters of credit and (3) the fact that NOB specifically inquired as to the past performance and future plans of F & T's operations. In fact, reliance on the ability of F & T to perform its obligations is proof of the privity relationship between F & T and NOB.

Section 5–103 of the Uniform Commercial Code defines a customer as "a buyer or *other person who causes* an issuer to issue a credit." M.C.L.A. § 440.5103(1)(g). F & T was not named as a customer in the letters of credit; however, there is no designation of a specific customer in any of the letters of credit under consideration. ('77 Exs. 1–3) The letters are addressed to Advance and state that they have been opened in favor of Old Orchard. Specific reference is also given to the Old Orchard by the Bay project. It is the position of the FDIC that since F & T was not specifically identified as the customer in the letters of credit, it has no right to sue for the wrongful termination of those letters of credit. It cites in support of this proposition the case of *Edgewater Construction Co., Inc. v. Percy Wilson Mortgage & Finance Corporation*, 44 Ill.App.3d 220, 2 Ill.Dec. 864, 357 N.E.2d 1307, 20 U.C.C.R.S. 990 (1976). Although the facts in *Edgewater* were substantially similar to the facts of the present lawsuit, the issue addressed by the court in *Edgewater* was quite different from the issue presented in this case. In *Edgewater* the court was requested to issue an injunction to restrain any payments made pursuant to the letters of credit. In the present case, however, the issue is whether the bankrupt corporation has standing to sue for damages incurred by the termination of the letters of credit based on the theory of breach of contract. In fact, the court in *Edgewater*

**12.** Although none of the parties have raised the issue, it is quite possible that the entire jurisdictional question in this lawsuit could be resolved by reference to the "sue and be sued" clause found in 12 U.S.C. § 1819 which states in part:

> ... the corporation [FDIC] shall become a body corporate and as such shall have power—

> . . . . .

> To sue and be sued, complain and defend in any court of law or equity ...

Similar clauses for other governmental agencies have been held to waive jurisdictional defects. For example, in the case of *Federal Housing Administration v. Burr*, 309 U.S. 242, 60 S.Ct. 488, 84 L.Ed. 724 (1940) the United States Supreme Court construed a "sue and be sued" clause to create a presumption in favor

of complete jurisdiction over the governmental agency. To quote the Court's exact words:
> ... it must be presumed that when Congress launched a governmental agency into the commercial world and endowed it with authority to 'sue and be sued' that agency is no less amenable to judicial process than a private enterprise under like circumstances would be.

> Clearly the words 'sue and be sued' in their normal connotation embrace all civil process incident to the commencement or continuance of legal proceedings. *Id.* at 245, 60 S.Ct. at 490.

*See also Bank of the United States v. Planters Bank of Georgia*, 22 U.S. (6 Wheat) 904, 6 L.Ed. 244 (1824); *Bowdoin v. Malone*, 284 F.2d 95 (5th Cir. 1960); *Reconstruction Finance Corp. v. Langham*, 208 F.2d 556 (6th Cir. 1953).

came to different conclusions on the issue of whether the general contractor was a customer under the letters of credit. The majority opinion states:

> Section 5–103(1)(g) states that a 'customer' is a buyer or other person who causes an issuer to issue a credit. There is a conflict in the evidence as to who caused State Bank to issue the letter. The letters themselves clearly identify the partnership as the customer. Davis delivered the subject letters to Percy Wilson. Notwithstanding his contradictory testimony, it is difficult to believe Davis did not read the letter, an important document to say the least, and was not aware that the partnership was identified as the customer. The security for the letters of credit obtained by State Bank through Davis was from the plaintiff. We do not think the record clearly established who caused the State Bank to issue the letters, if it was not the partnership. *Id.* at 998, 44 Ill.App.3d 220, 2 Ill.Dec. 864, 357 N.E.2d 1307.

The concurring opinion in *Edgewater*, however, came to a different conclusion when it stated:

> The majority states that the record does not support the conclusion that plaintiff is the customer under § 5–103(1)(g). As the majority notes, plaintiff entered into the Completion Assurance Agreement with Percy Wilson and the trustee who held title to the property. That agreement provided plaintiff was required to deposit certain money as a fund. The letter of credit was secured at State Bank, by promissory notes of plaintiff which were guaranteed by Davis. State Bank also received as security the beneficial interest of a certain land trust which is not a party to these proceedings. From this evidence I conclude that plaintiff was a customer within the meaning of § 5–103(1)(g). I do not believe that this finding affects the partnership who also may be a customer. I see no reason why there may not be more than one customer to a letter of credit. *Id.* at 1002, 44 Ill.App.3d 220, 2 Ill.Dec. 864, 357 N.E.2d 1307.

The concurring opinion in *Edgewater* appears to be the better view, especially in light of section 102(5)(a) of the Uniform Commercial Code which states that "words in the singular number include the plural, and in the plural include the singular." M.C.L.A. § 440.1102(5)(a). Although it is true that it was Investment which pledged the real estate which was titled in its name as collateral for the letters of credit, F & T also provided security to NOB by co-signing the notes, and thereby, lending its good name and assets as additional security for the benefit of NOB. In addition, there is no doubt that at the time of the issuance of the letters of credit NOB was fully aware of the purpose to which the letters of credit were being put and the fact that both Investment and F & T were to benefit from their issuance. Therefore, it is the opinion of this Court that F & T was a customer under the letters of credit, and as such, has standing to sue for the termination of the letters of credit and the resulting delay in releasing the collateral back to the parties.

### D. Liability of FDIC:

Outside of the issue concerning this Court's jurisdiction over the counter-complaint, the most hotly disputed issues in this lawsuit are the liability of the FDIC and the amount of damages F & T may recover. With respect to the FDIC's liability, the FDIC-receiver claims that the counter-complaint sounds in tort, and accordingly, it is barred by the Federal Tort Claims Act because it was not acted upon within the two-year limitation imposed under the Federal Tort Claims Act. In support of its position, the FDIC points to paragraphs 42 and 43 of the second amended counter-complaint which state:

> 42. The FDIC in its capacity as receiver, has violated the Federal Deposit Insurance Act by failing to distribute ratably the proceeds of the purchase of receivership assets and improperly preferred deposit creditors to F & T Contractors as a beneficiary under the letters of credit.

43. The FDIC as corporation is liable under the National Banking Act to compensate F & T Contractors for its failure as receiver to make distribution of the proceeds of sale of the receivership assets ratably.

There is no dispute that any tort claims being asserted against the FDIC would be barred by the Federal Tort Claims Act. In fact, counsel for the trustee acknowledged this in his opening argument at trial. Instead, reference was made to paragraph 29 of the second amended counter-complaint which states as follows:

29. F & T Contractors filed its Chapter XI petition as a direct result of the cancellation of the letters of credit and the subsequent refusal by FDIC to release the real estate pledged to secure those letters of credit, and the financial condition suffered by F & T Contractors thereby.

Accordingly, the position taken by counsel for the trustee is that the counter-complaint states a cause of action in both contract and tort. Although the tort claim would be barred, the contract claim should be viable. In other words, the theory of recovery is alleged to exist as a result of the anticipatory repudiation made by the FDIC-receiver when it terminated the letters of credit, and as a result, the FDIC-receiver is liable under the Uniform Commercial Code for a breach of contract. In addition, it is the position of the trustee that the FDIC in its corporate capacity is also liable for this breach of contract because it impliedly assumed all liability caused by the FDIC-receiver, as well as under the concept of *respondeat superior.*

There is no dispute as to the termination of the letters of credit by the FDIC-receiver and the fact that the collateral which was being held by the FDIC-receiver to secure those letters of credit was not returned to the proper parties until almost five months after termination.

The case of *Bossier Bank & Trust v. Union Planners National Bank,* 550 F.2d 1077 (6th Cir. 1977) clearly holds that any action on a letter of credit is one in contract. In the *Bossier* case the Court of Appeals for the Sixth Circuit stated the contractual nature of the action as follows:

The letter of credit constitutes an independent contract between the issuer and the beneficiary. If the beneficiary presents to the issuer his draft accompanied by the document(s) in proper form called for in the letter of credit, the draft must be honored. See *Banco Espanol de Credito v. State Street Bank and Trust Company,* 385 F.2d 230 (1st Cir. 1967) *cert. den.* 390 U.S. 1013, 88 S.Ct. 1263, 20 L.Ed.2d 163; *Dynamics Corporation of America v. Citizens and Southern National Bank,* 356 F.Supp. 991 (N.D.Ga.1973). As stated in T.C.A. 47–5–114 the issuer must honor the draft despite a nonconformity in the underlying contract. The Comments to Official Text state in relevant part:

1. The letter of credit is essentially a contract between the issuer and the beneficiary and is recognized by this Article [Chapter] as independent of the underlying contract between the customer and the beneficiary (See Section 5–109 and Comment thereto). In view of this independent nature of the letter of credit engagement, the issuer is under a duty to honor the drafts or demands for payment which in fact comply with the terms of the credit without reference to their compliance with the terms of the underlying contract. *Id.* at 1081.

Similarly, in the case of *Savarin Corporation v. National Bank of Pakistan,* 447 F.2d 727 (2nd Cir. 1971), the Court of Appeals for the Second Circuit held that an anticipatory repudiation of a letter of credit constitutes a breach of contract. The court therein stated:

Quite apart from the Bank's (NY) interpretation of the letters of credit as not requiring separate steamers, there was ample justification for the jury to conclude that no such requirement or restriction was contained therein. Therefore, the Bank's declared refusal to accept documents for shipment on one steamer was

*clearly an anticipatory breach of contract for which it should respond in damages.* Nor did the Bank show that it altered its position to its detriment in reliance on an 'assertion' by Savarin inferable from its initial request that the letters of credit be amended to permit 3,000-ton shipments as an anticipatory breach. *The judgment for breach of the contracts as evidenced by the letters of credit is affirmed.* (Emphasis added.) *Id.* at 731–732.

Therefore, a contract cause of action arose in favor of both F & T and Investment at the time of the anticipatory repudiation of the letters of credit by the FDIC-receiver. Aside from the issue of damages, however, there remains a question of whether the FDIC in its corporate capacity, which is the only collectable entity involved in this law suit, assumed the FDIC-receiver's liability under the agreement to transfer the "unacceptable assets." (*See* '81 Ex. 32.) The express terms of the agreement between the FDIC-receiver and the FDIC in its corporate capacity calls for a transfer and assignment of "all contracts, rights, claims, demands, choses in action or causes of action whatsoever." Therefore, there is no dispute that the FDIC in its corporate capacity was assigned all of the rights and benefits of the contracts involved in this case. However, the agreement between the FDIC-receiver and the FDIC in its corporate capacity is silent on the question of whether the FDIC in its corporate capacity assumed the liabilities of the FDIC-receiver.

As a general rule, if an assignee does not expressly assume the liabilities under a contract, whether there is an implied assumption of those duties is a matter of contract interpretation. There is a strong presumption in the law of contracts which holds that an assignee who receives rights under a contract also assumes the corresponding obligations. This is the view espoused by the Uniform Commercial Code when it provides:

An assignment of 'the contract' or of 'all my rights under the contract' or an assignment in similar general terms is an assignment of rights and unless the lan-

guage or the circumstances (as in an assignment for security) indicate the contrary, it is a delegation of performance of the duties of the assignor and its acceptance by the assignee constitutes a promise by him to perform those duties. This promise is enforceable by either the assignor or the other party to the original contract. M.C.L.A. § 440.2210(4).

The law in Michigan has a long and consistent history of cases which hold that an assignment of a contract constitutes an assignment of the rights thereof, as well as a delegation of the duties of the assignor. *See Detroit Postage Stamp Service Co. v. Schermack*, 179 Mich. 266, 146 N.W. 144 (1914) and *Jackson v. Sessions*, 109 Mich. 216, 67 N.W. 315 (1896). Other Michigan cases have reached the same result under the specific facts presented. *See Detroit, Toledo & Ironton Railroad Co. v. Western Union Telegraph Co.*, 200 Mich. 2, 166 N.W. 494 (1918), *C. H. Little Co. v. Cadwell Transit Co.*, 197 Mich. 481, 163 N.W. 952 (1917), and *Voigt v. Murphy Heating Co.*, 164 Mich. 539, 129 N.W. 701 (1911).

The presumption in the law of contracts with respect to an implied delegation of duties apparently has not been adopted by the Ohio Supreme Court. In fact, none of the briefs supplied by the parties, nor this Court's independent research, reveal any Ohio Supreme Court case which holds one way or the other on this rule of contract interpretation. In such circumstances, it is the position of counsel for the trustee that Michigan law should apply and reference is made to the case of *Chrysler Corporation v. Insurance Company of North America*, 328 F.Supp. 445 (E.D.Mich.1971). In *Chrysler* the court stated the applicable conflicts of law rule and the major exception thereto as follows:

The relevant conflicts of laws rule in Michigan, as established by the state's Supreme Court, provides that the construction of a contract must be governed by the law of the state in which the contract was made. *Rubin v. Gallagher*, 294 Mich. 124, 292 N.W. 584 (1940). Moreover, for the purposes of this con-

flicts rule, 'a contract is deemed to have been made in the State where the last act necessary to make it a binding agreement took place'. *State of Ohio ex rel. Squire v. Eubank* 295 Mich. 230, at 233–234, 294 N.W. 166, 167 (1940). *This conflicts rule, however, is subject to the exception that where the applicable foreign law has not been declared by the court of last resort in the foreign state with 'absolute certainty', then Michigan law must control an action instituted in a Michigan forum. Bostrom v. Jennings*, 326 Mich. 146, 154, 40 N.W.2d 97 (1949); *Schultz v. Tecumseh Products*, 310 F.2d 426 (6th Cir. 1962). (Emphasis added.) *Id.* at 448.

Therefore, since the Ohio Supreme Court has not expressed itself with "absolute certainty" on the issue of whether to apply the presumption that an assignment of rights includes an implied assumption of duty as well, this Court is bound to apply the relevant Michigan case law. The most recent expression by the Michigan courts in this regard is in the case of *Keyes v. Scharer*, 14 Mich.App. 68, 165 N.W.2d 498 (1968). In *Keyes*, the court specifically declined to apply the Uniform Commercial Code because it had been adopted in Michigan only shortly before the transaction was entered into which formed the basis of the lawsuit in *Keyes*. Even without the benefit of the language of the Uniform Commercial Code, the court in *Keyes* concluded:

... If an assignee does not expressly assume his assignor's obligations it becomes a question of interpretation whether he has impliedly agreed to assume such obligation.

. . . .

In deciding that question of interpretation we look to the language of the assignment and the surrounding circumstances... (Footnote omitted.) *Id.* at 72, 165 N.W.2d 498.

Section 2–210 of the Uniform Commercial Code and the *Keyes* decision convince this Court that it is permissible for a court sitting without a jury to make a finding of fact as to whether an assignee who receives certain benefits, but does not expressly assume liabilities, nonetheless is to be held accountable for an assumption of liabilities as well. There is no question under the facts of this case that the FDIC acting in its corporate capacity assumed both the assets and liabilities from the FDIC-receiver which were not specifically assigned to the assuming bank. The reason for this conclusion is found in the fact that the FDIC-receiver assigned all of the assets and liabilities of NOB either to the assuming bank or the FDIC in its corporate capacity by entering into the agreements approved by the Cuyahoga County Court on February 17, 1975. (*See* '81 Ex. 32.) By accepting the assets offered by the FDIC-receiver, the FDIC in its corporate capacity was fully aware that any attempt it may make on collecting the contract cause of action it had against the bankrupt corporation may be subject to a counterclaim for damages caused by the FDIC-receiver. Its insistence on the execution of a complete release as a condition precedent to the return of the collateral is eloquent proof of the FDIC's knowledge of the true facts. Since the parties to that contract, namely the FDIC-receiver and the FDIC in its corporate capacity, did not specifically exclude an assumption of liabilities, this Court concludes that there was a corresponding, although implied, assumption of the liabilities as well. Accordingly, the FDIC in its corporate capacity is liable for the FDIC-receiver's breach of contract under the letters of credit. Additionally, under the concept of *respondeat superior*, the same result would ensue.

## E. Calculation of Damages:

Most of the testimony received at trial and much of the oral argument presented by counsel for the parties centered on the competing claims for damage the parties assert against one another. The question of damages owed from the estate to the FDIC in its corporate capacity has already been discussed in detail and shall not be reiterated here. Suffice to say that the FDIC in its corporate capacity is entitled to a judgment in the amount of $152,-

375, and this award shall be accorded priority as an administrative expense. The question remaining, however, is the extent of damages owed by the FDIC to the bankruptcy estate.

Mr. Cuvrell, the operating receiver and trustee of F & T, and Mr. Birnbaum, the president and chief operating officer of F & T, testified extensively on the issue of damages owing to F & T as a result of the anticipatory repudiation of the letters of credit and undue delay in releasing the collateral. Each of these witnesses has extensive experience in the construction industry, and in all probability, could have been qualified as expert witnesses, although this was not done. For example, Mr. Cuvrell's credentials include more than twelve years experience in the construction industry, more than ten years of experience as a management consultant, he has taught many courses on business management at the collegiate level and has had a long and successful appointment on the panel of Chapter 11 trustees in this Court. Mr. Birnbaum also might qualify as an expert in that he was the president and chief operating officer of F & T for more than fifteen years and had experience in the construction industry even before he became involved with F & T. There has been no dispute as to the credibility of either of these witnesses, and in the opinion of this Court, their testimony was completely competent and credible.

The elements of damage claimed under the counter-complaint includes the following: (1) loss of profit, (2) the proportionate increase in overhead expenses occasioned by the delay in returning the collateral which secured the letters of credit, (3) the cost overruns which are directly attributable to increased cost of services and materials incorporated into the project after resumption of construction activity and (4) the allowed costs and expenses of the bankruptcy proceedings. Although each of these elements of damage shall be discussed separately, a review of the exhibits and testimony adduced at trial indicates that the operating receiver and trustee, Mr. Cuvrell, seeks damages in the following amounts:

| | |
|---|---|
| Loss of Profit | $130,094.52 |
| Increased Overhead | 162,488.04 |
| Cost Overruns | 279,525.40 |
| Bankruptcy Expenses | 353,500.28 |
| Total | $925,608.24 |

Each element of the damages sought against the FDIC is based, at least in part, on one principal factor; namely, the unreasonable delay in releasing the collateral by the FDIC and the resulting cessation of cash flow to the bankrupt corporation. In support of this theory of recovery, both the exhibits and the testimony received clearly illustrates that the debtor was a completely profitable and viable concern until the termination of the letters of credit and was approximately three months ahead of schedule on the Old Orchard by the Bay project at the time of the termination. Mr. Cuvrell testified that at the time he decided to assume the construction contract and complete the project, his calculations estimated that the project could be completed by July 15, 1975. This assumption, of course, was based on the return of the collateral in order to recommence the construction draws from Advance. As a direct result of the undue delay in returning that collateral, the project was not completed until February 6, 1976. In other words, the project was three months ahead of schedule at the time of the termination of the letters of credit, February 14, 1975, and in March of 1975, Mr. Cuvrell expected to complete the project by July 15, 1975. However, the collateral was not returned by the FDIC until July 2, 1975. ('77 Ex. 7). Therefore, the FDIC withheld the collateral from February 14, 1975 through July 2, 1975, a period of almost five months. As a result, the project was not completed until February 6, 1976, 114 days after the completion deadline date of October 14, 1975. ('81 Ex. 3.) Clearly, the causal connection is complete when the exhibits and testimony prove that a construction project which was three months ahead of schedule before the construction draws were discontinued as a result of the termination of letters of credit and ended up being completed almost three months behind schedule when it is shown that the collateral which was used to secure the construction mortgage was not returned

for almost five months. Since the real property was the sole resource which could be used by the receiver to obtain construction funds, the proximate cause of the damages claimed is apparent.

The loss of profit occasioned by the operating receiver is directly attributable to the delay in performance of the construction project. Since the project was completed 114 days after the construction completion deadline, the liquidated damage clause contained in the construction contract ('81 Ex. 3) in the amount of $1,141.18 per day was invoked to reduce the amount of profit promised by the amendment to the construction contract ('81 Ex. 4) which amounted to a total reduction of $130,094.52. Hence, the claim for loss of profit of $130,095.52.

Likewise, the increased overhead experienced on the project is related to the reduction in the overall rate of the pace of completion of the project which was occasioned by the termination of the letters of credit. In support of this element of damages, Mr. Cuvrell again testified that his review of the rate of completion of the project, which was three months ahead of schedule in February of 1975, would support a projected completion date of about July 15, 1975. His calculation was based on an analysis of the draw schedules ('81 Exs. 14 and 15) which show that the project was approximately 60% complete at the time of the termination of the letters of credit and that approximately 8% of the project was being completed each month. At this pace, the project should have been completed by July 15, 1975. As a result of the cessation of operations caused by the termination of the letters of credit, however, the rate of completion was reduced to approximately 3.3% per month with a corresponding reduction in the amount of draws received from the mortgage lender, Advance.

An exhibit was introduced to prove the changes in income and cash flow statements that were kept by Mr. Cuvrell during the Chapter XI proceedings. (See '81 Ex. 38).

From those statements, it was shown that the Old Orchard by the Bay project generated 57.29% of the total income earned by F & T during this period of time. Mr. Cuvrell also testified that it was common practice in the construction industry to allocate overhead expenses in proportion to income generated. Based on these calculations, Mr. Cuvrell was able to allocate $796.51 per day as the overhead expense incurred for the Old Orchard by the Bay project from July 15, 1975, the projected completion date, through February 6, 1976, the actual completion date. This was a period of 204 days at a cost of $796.51 per day, which supports the element of damages claimed for increased overhead in the amount of $162,488.04. He also calculated, however, the increased overhead incurred from October 14, 1975, the completion deadline contained in the construction contract, through February 6, 1976, the actual completion date, and testified that the increased overhead for this period of time would have amounted to $90,802.14.

The cost overruns for services and materials were calculated by Mr. Cuvrell in the total amount of $404,538.69. This figure was determined without reference to any changes made in the construction plans and was calculated from the bid amounts included in the original bid made by F & T. The figure was reduced by $125,013.29 as a result of an increase in the morgage which would have already paid for some of the cost overruns, and thereby not a compensable portion of the cost overruns. Therefore, Mr. Cuvrell calculated the cost overruns attributable to the increase in the amount paid to materialmen and subcontractors as a result of the delay in the construction project to be $279,525.40 as a result of the termination of the letters of credit and undue delay in releasing the collateral.

The final element of damages is the bankruptcy expenses. The summary of these costs and expenses totaled $353,500.28 ('81 Ex. 40). However, at the time of trial only $292,639.60 of the claimed administra-

tive expenses and statutory fees had actually been allowed by this Court.[13]

The FDIC disputes the amount of damages claimed by the bankrupt corporation. In addition to extensive cross examination as to the methods utilized by the trustee, Mr. Cuvrell, in calculating the damages, it is the position of the FDIC that the only damages which can be properly allowed for the letters of credit are the face amount of the letters of credit plus incidental damages. Counsel for the FDIC cites the case of *New York Life Insurance Co. v. Hartford National Bank & Trust Co.*, 19 U.C.C. R.S. 1377 (Conn.Sup.Ct.1975) and section 5–115(1) of the Uniform Commercial Code in support of this position. The face amount of the letters of credit in the present lawsuit total $275,113.62. ('77 Exs. 1–3.)

The FDIC also disputes the claim for damages against it on the basis that such damages were not foreseeable. In support of this allegation, reference is made to the cases of *Brodsky v. Allan Hayosh Industries, Inc.*, 1 Mich.App. 591, 137 N.W.2d 771 (1965) and *Feldman v. Wear-U-Well Shoe Co.*, 191 Mich. 73, 157 N.W. 395 (1916).

Based on the cases and statutes cited by the FDIC, counsel for the FDIC takes the position that the only possible damages recoverable by the trustee are the face value of the letters of credit, in compliance with the rule against allowing damages to be assessed against a party who could not foresee those damages. This position, however, is faulty in two respects. First, all of the cases of which this Court is aware concerning damages awarded upon anticipatory repudiation of a letter of credit involved traditional types of letters of credit. For example, in *Savarin Corporation v. National*

13. The expenses and fees enumerated in Exhibit 40 includes some "estimates" for certain costs and requests for attorney fees which have not yet been approved by this Court. Therefore, the following expenses and fees are to be included in this element of damage because they can be determined by statute or have already been approved:

| | | |
|---|---|---|
| Expenses and fees paid to the Operating Receiver: | | |
| a) Statutory fees | $109,674.00 | |
| b) Allowed expenses | 3,679.68 | $113,353.68 |
| Allowed auctioneer's fees | | 38,691.79 |
| Court costs and reporter's fees: | | |
| a) Statutory court costs | 36,585.46 | |
| b) Allowed court reporter's fees | 1,292.00 | 37,877.46 |
| Allowed appraisers' fees | | 34,737.50 |
| Expenses and fees paid to the Trustee: | | |
| a) Statutory fees | 13,771.38 | |
| b) Allowed clerical expenses | 10,662.79 | |
| c) Allowed miscellaneous expenses | 5,106.71 | |
| d) Allowed printing expenses | 867.20 | |
| e) Allowed travel expenses | 317.04 | |
| f) Allowed bond fee | 180.00 | 30,905.12 |
| Allowed attorney fees for operating receiver's attorneys | | 16,377.05 |
| Allowed attorney fees for bankrupt's attorney | | 16,000.00 |
| Allowed attorney fees for creditors committee's attorney | | 3,197.00 |
| Allowed rental payments as administrative expenses | | 1,500.00 |
| Total | | $292,639.60 |

The above calculations do not include any administrative expenses or requests for fees which have not been approved by the Court. Although it is abundantly clear that there will be additional administrative expenses, court costs and fees allowed before the closing of this estate, since these figures are not liquidated at the present time, they cannot be included in the calculation of damages.

*Bank of Pakistan, supra,* the subject of the underlying contract was for the sale of wheat pursuant to Article 2 of the Uniform Commercial Code. Likewise, the underlying contracts in *Bossier Bank & Trust Co. v. Union Planners National Bank of Memphis, supra,* and *New York Life Insurance Co. v. Hartford National Bank & Trust Co., supra,* concerned the sale of goods. The only case of which this Court is aware concerning a financing arrangement with letters of credit to secure mortgage obligations is the *Edgewater* case which has no precedential value in this Court, and indeed, this Court has already adopted the concurring opinion in *Edgewater* as opposed to the views espoused in the majority opinion.

It is the opinion of this Court that a letter of credit transaction which is authorized by Article 5 of the Uniform Commercial Code is not restricted to the damage provisions provided in Article 2 of the Uniform Commercial Code. If the underlying transaction concerns a sale of goods and the letter of credit is issued to insure payment to the seller upon breach by the buyer, then section 5–115 of the Uniform Commercial Code makes plain sense in referring to remedies provided under Article 2 of the Uniform Commercial Code. However, such is not the case in the present lawsuit. The letters of credit issued by NOB were procured for the purpose of securing a mortgage construction loan and not for the purpose of insuring payment under a contract for the sale of goods. In addition, the collateral used to secure the letters of credit also involved mortgages. Under such circumstances, this Court is of the opinion that it should defer to the more general principles of law in supplementing the provisions of Article 5 of the Uniform Commercial Code. This view is expressly permitted by the Uniform Commercial Code itself when it states:

> Unless displaced by the particular provisions of this act, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provisions. M.C.L.A. § 440.1103.

It should be remembered that NOB was given three different mortgages and mortgage notes which were co-signed by F & T. These mortgages and mortgage notes were to be the collateral to which NOB would have looked in the event there would have been a payment under the letters of credit. Furthermore, the letters of credit were issued for the purpose of securing obligations arising under a construction mortgage. Under these circumstances it makes little sense to this Court that the only damages recoverable for a breach of the obligations of the issuer of the letters of credit are those provided for a breach of contract for the sale of goods. Rather, the appropriate remedy should be the same as the civil liability imposed upon a mortgagee for refusal to discharge or otherwise release his lien upon real property. In Michigan, such liability is imposed by statute, which states in its entirety:

> If any mortgagee, or his personal representative or assignee, as the case may be, after full performance of the condition of the mortgage, whether before or after a breach thereof, or if the same be entirely due and payable, after a tender of the whole amount so due and payable thereon, shall, for the space of 7 days after being thereto requested, and after tender of his reasonable charges, refuse or neglect to discharge the same as provided in this chapter, or to execute and acknowledge a certificate of discharge or release thereof, he shall be liable to the mortgagor, his heirs or assigns, in the sum of 100 dollars damages, and also for all actual damages, occasioned by such neglect or refusal, to the person who shall perform the condition of such mortgage, or make such tender to the mortgagee, his heirs or assigns, or to any one who may have an interest in the mortgaged premises, to be recovered in an action on the case, or be awarded by a court of equity upon a bill filed to procure a discharge, or a release of such mortgage, with double costs, in the discretion of the court. M.C.L.A. § 565.44.

There is no doubt in this Court's mind that at the time of the termination of the letters of credit the FDIC, either in its capacity as the receiver for NOB or in its corporate capacity and as holder of the mortgage notes, should have released the mortgage obligations and its lien on the real property. Mr. Birnbaum testified at trial that had the FDIC released its mortgages promptly, he could have immediately procured substituted letters of credit from a solvent bank, and by doing so, completely avoid any interruption in the construction of the Old Orchard by the Bay project.

Mr. Birnbaum further testified that he telephoned the FDIC-receiver immediately after he had received notice of the termination of the letters of credit, and his attorney even made a formal demand for the release of the collateral in a letter dated February 28, 1975 ('81 Ex. 18). Therefore, the arguments advanced on behalf of the FDIC do not appear to counter the direct and undisputed testimony and exhibits received at trial. The assertion that the measure of damages should be limited to the face amount of the letters of credit is not applicable because the nature of the financing arrangement of which all the parties were aware, included the construction of a large residential project. Even more significant, however, is the fact that the FDIC-receiver was placed on actual notice of the necessity of releasing the real estate collateral. Having failed to do so, it cannot deny liability for actual damages under the appropriate statute.

The leading Michigan case cited in support of the statute which imposes civil liability for actual damages for the refusal to release mortgaged property is *Dunitz v. Satovsky*, 243 Mich. 423, 220 N.W. 717 (1928). *See also Cowles v. Marble*, 37 Mich. 158 (1877). The only defense to such an action is that the mortgage obligation has not been completely satisfied. *See Wilber v. Pierce*, 56 Mich. 169, 22 N.W. 316 (1885) and *Huxford v. Eslow*, 53 Mich. 179, 18 N.W. 630 (1884). It should also be noted that this is the law of the state of New York. *See Halpin v. Phenix Insurance Co.*, 118 N.Y. 165, 23 N.E. 482 (N.Y.Ct.App.1890).

Therefore, it is the holding of this Court that the amount of damages recoverable upon the breach of contract under the letters of credit are not limited to the face value of those letters of credit. Rather, pursuant to M.C.L.A. § 565.44 and the case of *Dunitz v. Satovsky, supra,* which are specifically adopted by the Uniform Commercial Code in section 1–103, the FDIC-receiver and the FDIC in its corporate capacity are jointly and severally liable for the actual damages incurred by the bankrupt corporation as a result of the anticipatory repudiation of the letters of credit and the unreasonable delay in releasing the mortgage commitments against the real estate used to secure the letters of credit.

The record totally supports the elements of damage for loss of profit and increased overhead. The loss of profit was calculated to be $130,094.52, based on the 114 days which the bankrupt corporation was charged with liquidated damages of $1,141.18 per day pursuant to the construction contract. Similarly, the record supports the damages sought for increased overhead in the amount of $162,488.04, based upon the increased overhead expenses experienced by the trustee as a result of the delay in completion of the construction project. Both the claim for loss profit and the claim for increased overhead expenses were clearly foreseeable and have been calculated in a reasonable manner. Accordingly, it is the holding of this Court that these amounts can be recovered against the FDIC.

With respect to the other elements of damage asserted by the trustee, however, a review of the method of calculation does not support the amounts sought. For example, the trustee seeks $279,525.40 as cost overruns directly attributable to portions of the construction project which were not substantially completed at the time of the termination of the letters of credit. In calculating these damages, Mr. Cuvrell included $28,548.80 for rough and finished carpentry ('81 Ex. 28). Since this was a portion of the project which was substan-

tially completed at the time of the termination of the letters of credit, it should not be included as a cost overrun. In addition, Mr. Cuvrell included $75,086.71 as soft construction costs which were actually paid by Advance and included in the supplemental mortgage note dated February 1, 1977 ('81 Ex. 29). Since these soft construction costs were paid by the mortgage lender, no damage resulted to F & T. As a result, the $279,525.40 claim for cost overruns should be reduced by $103,635.51 ($28,548.80 + $75,086.71) which equals a total damage award for cost overruns of $175,889.89.

The final element of damages in the amount of $353,500.28 for the administrative expenses and statutory fees incurred in the bankruptcy proceedings should also be reduced. A review of the administrative expenses and statutory fees actually allowed by this Court in these proceedings is in the amount of $292,639.60. Since these are the actual and allowed costs of administration, and would not have been paid if the letters of credit had not been terminated and the collateral withheld, they are recoverable as an element of damages.[14]

Based on the foregoing adjustments to the claims for damages alleged by the trustee against the FDIC, it is the holding of this Court that the trustee can recover against the FDIC $130,094.52 for loss of profit, $162,488.04 for increased overhead, $175,889.89 for cost overruns and $292,639.60 for the expenses and fees in bankruptcy. These figures equal a total amount owing from the FDIC-receiver and the FDIC in its corporate capacity, jointly and severally, in the amount of $761,112.05.

*Conclusion*

The evidence and testimony received by this Court during the course of this trial, as well as a review of all the pleadings and applicable portions of the court files overwhelmingly convinces this Court that the plaintiff, the FDIC in its corporate capacity, is entitled to a judgment against the defendants in the amount of $152,375.00

which may be used in support of a claim as an administrative expense. Similarily, the proofs established by a clear preponderance of the evidence and testimony, as well as the applicable statutes and case law, that the defendants and counter-plaintiffs are entitled to a judgment against the counter-defendants, jointly and severally, in the amount of $761,112.05. Each party having prevailed in part, no costs are to be taxed.

However, since the damage awards are against the same parties, they can be set off for a net judgment against the FDIC and in favor of the estate in the amount of $608,737.05.

A separate order shall be entered in accordance with this opinion.

### APPENDIX

### MEMORANDUM OPINION

At a session of said court on the 10th day of April, 1980.

HAROLD H. BOBIER, Bankruptcy Judge.

Before the court is the motion of the plaintiff, Federal Deposit Insurance Corporation, (herein "FDIC") for summary judgment. The motion is brought under Federal Rule of Civil Procedure (FRCP) 56, which is made applicable in bankruptcy proceedings by virtue of Federal Rule of Bankruptcy Procedure (FRBP) 756.

### I

F & T Contractors, Inc. (herein "bankrupt") was engaged as the general contractor of a high rise residential housing project known as Old-Orchard-By-the-Bay. The owner of the real estate was a Michigan limited partnership, Old Orchard By the Bay Associates (herein "owner"). The project was financed with a construction mortgage committed to the owner by Advance Mortgage Corporation. This mortgage was issued pursuant to an insurance

---

14. *See* note 13, *supra*, wherein the allowed costs, expenses and fees are specifically enumerated.

commitment issued by the Department of Housing and Urban Development (herein "HUD").

One of the conditions of the insurance commitment issued by HUD and the mortgage commitment issued by Advance Mortgage was the requirement for letters of credit. Two were required. One was to assure Advance Mortgage that adequate working capital would be provided. The second represented an amount sufficient to cover the finance charge (commonly referred to as "points") required to be paid to consummate the sale of the fully disbursed mortgage by Advance Mortgage.

Two irrevocable letters of credit, numbers 1129 and 1130 which were both dated July 2, 1974, were issued in favor of Advance Mortgage by the Northern Ohio Bank (herein "NOB"). As security for these letters of credit, promissory notes, real estate mortgages and certain equipment leases were given to the NOB. The bankrupt was a co-signer of these security instruments, along with the owner, and another entity, F & T Investment and Leasing Company (herein "F & T Investment"). Many of the same individuals were principals in all three of these entities.

As is typical in the construction industry, the owner would make periodic applications for advances of mortgage proceeds. If HUD and the supervising architect approved the application as acceptably completed, the amount applied for, less a ten percent holdback and any prior advances, would be paid by Advance Mortgage to the owner.

The amount of the construction mortgage was based upon the estimated costs of construction. This included material and labor, taxes, insurance, interest and other items of overhead. The completion of the project on schedule was essential to prevent the costs from exceeding the amount of the construction mortgage. By mid-February 1975 the project was approximately two months ahead of schedule.

On February 14, 1975 the Ohio superintendent of banks petitioned to have the NOB closed due to insolvency. The Common Pleas Court of Cuyahoga County, Ohio ordered that the FDIC be appointed receiver of NOB on February 14, 1975. On February 17, 1975, the FDIC as receiver of the NOB (herein "Receiver"), pursuant to leave granted by the Cuyahoga County Court of Common Pleas, transferred all the "acceptable" assets of the NOB to the National City Bank (herein "NCB"). As part of the consideration for the receipt of the "acceptable" assets, the NCB agreed to assume certain disclosed liabilities of the NOB. These liabilities included deposit accounts as well as other items, such as the expenses of operating the NOB and its branches. The letters of credit issued to Advance Mortgage were not among the disclosed liabilities assumed by the NCB.

As part of the agreement between the Receiver and the NCB, all of the "unacceptable" assets as well as the unassumed liabilities of the NOB were to be taken over by the FDIC in its Corporate capacity (herein "Corporation"). As will be subsequently discussed, these dual capacities of the FDIC are well recognized.

On February 19, 1975 the FDIC gave notice to the bankrupt of the cancellation of the irrevocable letters of credit. The capacity of the FDIC in giving this notice is unclear and is one of the points to be litigated in this suit. Upon receiving notice of the cancellation, Advance Mortgage ceased processing construction draws and the bankrupt was left without funds to complete the construction project. In an attempt to secure a new line of credit, the bankrupt and the owner attempted to gain a release of the real estate mortgages then held by the FDIC which had originally been given as security for the letters of credit issued by the NOB, which letters of credit the FDIC had cancelled. The FDIC refused to release the mortgages.

As a result of the loss of financing, the bankrupt was forced to petition for relief under Chapter XI of the Bankruptcy Act of 1898, as amended, on March 5, 1975. David A. Cuvrell, trustee of the bankrupt estate, was appointed receiver under Chapter XI.

After considerable delay, work on the construction project was restarted and eventually completed. Part of the arrangement under which work was begun again included the release of the real estate mortgages held by FDIC to Advance Mortgage. Part of the release agreement included a discharge by the owner and F & T Investment of any claim which they might have against the FDIC for wrongful cancellation of the letters of credit. The bankrupt was not a party to this agreement.

Prior to being able to restart construction, it was necessary for the bankrupt (which at that time was operating under Chapter XI) to renegotiate, at higher prices, agreements with materialmen and subcontractors, in addition to hiring new subcontractors and materialmen, also at increased cost. The project was eventually completed in February of 1976, approximately four months behind schedule.

Resulting from the delay in construction, which caused additional charges for interest and insurance to accrue as well as the extra costs incurred under the new agreements with subcontractors and materialmen, the amount received by the bankrupt from the construction mortgage was approximately five hundred and seventy thousand dollars short of covering costs actually incurred. The bankrupt also lost an estimated one hundred sixty-five thousand dollars in expected profits. The total loss on the project was approximately seven hundred thirty four thousand dollars. As a result of this shortfall, a petition to convert from Chapter XI to a straight bankruptcy was granted on February 11, 1977. David Cuvrell was appointed liquidating trustee. The administrative costs incurred in liquidating the estate of the bankrupt approximate two hundred and four thousand dollars.

The controversy presented to this court today was instituted on February 9, 1976. At that time the FDIC filed suit to collect monies due under leases between the bankrupt and F & T Investment. These leases and the proceeds thereunder had been given as security to the NOB for the extension of credit. Upon the liquidation of the NOB,

the FDIC took over these security interest leases. The amount claimed by FDIC was approximately six hundred and forty thousand dollars.

The matter is further complicated by the existence of apparently overlapping security agreements covering the same collateral. The Second National Bank of Saginaw became embroiled in this litigation in March and April of 1977 due to its claim as a secured party in the same property claimed by the FDIC in its complaint. This matter is still to be finally resolved, pending the outcome of the suit between FDIC and the bankrupt.

As a defense to the claim of the FDIC, the trustee of the bankrupt's estate asserts the cancellation of the letters of credit. This was asserted in response to the FDIC's motion for summary judgment and by way of a counter-complaint.

## II

This matter comes to the court today on FDIC's motion of April 17, 1979 for summary judgment under FRCP 56. The theory behind the FDIC's motion is that the counter complaint states a claim only against the Receiver, and since the FDIC in its Corporate capacity is the plaintiff in this lawsuit, this court is unable to afford any relief to the bankrupt. Plaintiff asserts that the bankrupt cannot counter-sue the FDIC in it's Corporate capacity, relegating the bankrupt to a suit against the Receiver only, a straw man without assets.

## III

It should be noted at the outset that no objection to the jurisdiction of this court has been raised at any time. See 11 U.S.C.A. §§ 11(a) (1966 and Cum.Supp.1979) and 46(b) (1953). Under the court rules, the failure to assert an objection to jurisdiction "by a timely motion or answer, whichever is first served" operates as a waiver of any objection. FRBP 915(a). In addition, by the initial application to this court for affirmative relief the FDIC has voluntarily submitted itself to the jurisdiction of this court. The fact that this litigation has con-

tinued for a substantial period of time without any objection to jurisdiction being voiced also operates to confer jurisdiction. *See Coffman v. Cobra Mfg. Co.*, 214 F.2d 489 (9th Cir. 1954), *cert. den.* 348 U.S. 912, 75 S.Ct. 291, 99 L.Ed. 715, *reh. den.* 348 U.S. 956, 75 S.Ct. 436, 99 L.Ed. 747; *Baker v. National City Bank of Cleveland*, 387 F.Supp. 1137 (N.D.Ohio 1974), *aff'd.* 511 F.2d 1016 (6th Cir. 1975).

## IV

The problem presented by the FDIC's summary judgment motion, as is the case of all such motions, concerns the existence of any disputed facts. FRCP 56(c). If there is no genuine issue as to any material fact, a motion for summary judgment should be granted. However, where it is determined that there *is* a genuine issue of material fact presented by the case, the motion should be denied, and the matter fully tried. *Lashlee v. Sumner*, 570 F.2d 107, 110–111 (6th Cir. 1978). This is because the court "may not resolve disputed facts on a motion for summary judgment." *Id.*, at 111; *Felix v. Young*, 536 F.2d 1126, 1130 (6th Cir. 1976). To do otherwise would permit litigants to be deprived of a full trial of the genuine issue in the case. This, of course, is totally impermissible. *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 468, 82 S.Ct. 486, 488, 7 L.Ed.2d 458 (1962).

In ruling on a motion for summary judgment, it is well established that a court should indulge in every reasonable inference from the facts in favor of the party opposing the motion. See, *e.g., American Telephone and Telegraph Co. v. Delta Communications Corp.*, 590 F.2d 100 (5th Cir. 1979). That is, if the non-moving party, in this case the bankrupt, raises a

"genuine issue of material fact and the evidentiary matter in support of the motion does not establish the absence of the genuine issue, summary judgment must be denied *even if* no opposing evidentiary matter is presented. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 160, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970)."

*Dalke v. Upjohn Co.*, 555 F.2d 245, 248 (9th Cir. 1977). Emphasis in the original.

In reviewing the pleadings and record in this case, it is apparent to the court that there are genuine facts in dispute. The existence of these disputed facts, which are discussed below, mandate that the FDIC's motion for summary judgment be denied.

## V

It cannot be seriously contended that given the proper circumstances, the FDIC may not simultaneously act as separate entities known as the "Receiver" and the "Corporation". *Freeling v. Sebring*, 296 F.2d 244 (10th Cir. 1961). The parties in the case have also agreed that the suit to enforce the security interest leases given to the failed bank, the NOB, is brought by the FDIC in its Corporate capacity, and not by the Receiver. See FDIC's Motion of April 17, 1979 for Summary Judgment, Defendant's Brief in Opposition to Motion for Summary Judgment of November 16, 1979. *See also FDIC v. Godshall*, 558 F.2d 220 (4th Cir. 1977). But it is the events relating to the security interest leases that form the subject matter of this suit. In view of the interrelation between the complaint and countercomplaint, to split these causes of action makes little sense. As is discussed below, the circumstances herein fit squarely within the same transaction test of FRCP 13.

The crux of the claim asserted by the FDIC before this court revolves around the leases held as security which the FDIC seeks to enforce. Even if the record were viewed in the light most favorable to the FDIC, substantial questions remain unanswered regarding these security interest leases. Nowhere in these proceedings has it been shown that the original transaction between the NOB and the various entities involved in the construction project was without question. The execution and validity of these documents has been impliedly assumed by all, but never expressly agreed to.

The more serious question, however, concerns the attempt of the FDIC to enforce the security interest leases and at the same

time deny the bankrupt the right to assert any defense to the claim. The FDIC posits that, as Receiver of a failed state bank, it can take over assets belonging to the bankrupt, transfer these assets back to itself, in either its Corporate capacity or in its capacity as Receiver, attempt to realize upon these assets by suing the bankrupt, and at the same time deny the bankrupt the right to assert any defenses to the claim by way of countercomplaint. The court has some difficulty in accepting this view. In raising the defense that it cannot be sued for its action because the bankrupt should pursue the Receiver or liquidator, an entity that appears to be a straw man without assets, the plaintiff FDIC would deprive the bankrupt defendant the right to raise a defense congnizable at law. The FDIC would relegate the bankrupt to a suit in an Ohio court on issues inextricably bound in the facts presented to this court. The court believes that such an approach is unduly dogmatic in placing form over substance and would operate to deny due process to the bankrupt.

The unresolved matters in this suit concern the claim of the FDIC for payments under the leases held as security for the issuance of letters of credit and the counter-claim of the bankrupt questioning the validity of the leases held as security once the purpose for their existence, *i.e.*, securing the letters of credit, has ended, as well as the damages suffered by the bankrupt stemming from the cancellation of the letters of credit. *First Empire Bank v. FDIC,* 572 F.2d 1361 (9th Cir. 1978). If the position of the FDIC were to be adopted, what might have been resolved in one proceeding would require appearances before two different courts. This is the antithesis of the historic equitable nature of bankruptcy proceedings. This court believes such a bifurcation of these proceedings will serve no purpose other than to delay the orderly administration of this bankrupt's estate and to increase the costs incurred by all parties by having to, in effect, try the same case twice.

## VI

There is one additional point which, although neither side has raised it in their brief, compels the court to hear this matter in toto. FRBP 713 sets out the rules for counterclaim and cross-claim, and adopts Civil Rule 13. In looking at the totality of this litigation, it is clear to this court that the counterclaim of the bankrupt is compulsory in this action.

FRCP 13(a) states in applicable part, "Compulsory Counterclaims. A pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, *if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim* and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction..." Emphasis supplied.

The subject matter of the FDIC's claim is the security interest leases, which the FDIC seeks to enforce. The subject matter of the bankrupt's counterclaim arises out of these same security interest leases and goes to the very heart of their validity or enforceability. This situation is analogous to the facts presented in *In the Matter of Business Data Center, Inc. (Burroughs Corp. v. Business Data Center, Inc.),* 2 Bankr.Ct.Dec. 169 (D.N.J.1976). In *Business Data,* Burroughs leased computer equipment to Business Data. Burroughs sought to reclaim the computer and to recover the payments which were in arrears. Business Data responded with a counterclaim which, among other things, alleged certain violations of the lease agreement by Burroughs which precipitated the filing of a Chapter XI petition by Business Data. The court, citing *In re Farrell Publishing Corp.,* 130 F.Supp. 449 (S.D.N.Y.1955) held

"(i)t cannot be denied that if Burroughs sued Business Data and recovered a judgment, Business Data would thereafter be barred from a separate suit at a later date arising out of the same contract. The Rule is designed to avoid circuity and multiplicity of actions where there is a logical relationship between the claim

and counterclaim, and is compulsory under the same evidence test." 2 B.C.D., at 173.

See also *In re Belmetals Mfg. Co.*, 299 F.Supp. 1290 (N.D.Cal.1969) to the same effect.

## VII

In summary, it is the opinion of this court that genuine issues of material fact have been framed in this case. For example, it is unexplained as to how the security for a letter of credit can survive the cancellation of the letter of credit. Also unanswered are how the security can be negotiated, transferred or assigned without the holder, transferee or assignee also being subject to any underlying defense, as well as the effect of a cancellation of an irrevocable letter of credit. This court will, therefore, DENY the FDIC's motion for summary judgment.

This matter will be placed on the court's trial calendar, with a Pre-Trial meeting set for 10:30 a. m., Monday, April 21, 1980, in the U.S. Bankruptcy Court, Federal Building, 600 Church Street, Flint, MI.